David Boies*
dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

Philip C. Korologos*
pkorologos@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

Sophia M. Rios (305801)
srios@bm.net
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300 / Fax: (215) 875-4604

Eric L. Cramer*
ecramer@bm.net
Michael C. Dell'Angelo*
mdellangelo@bm.net
Caitlin G. Coslett*
ccoslett@bm.net
Patrick F. Madden*
pmadden@bm.net
Michaela Wallin*
mwallin@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000 / Fax: (215) 875-4604

George A. Zelcs*
gzelcs@koreintillery.com
Robert E. Litan*
rlitan@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Ave., Suite 1950
Chicago, Illinois 60601
Tel.: (312) 641-9760 / Fax: (312) 641-9751

Carol L. O'Keefe*
cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh St., Suite 3600
St. Louis, Missouri 63101-1625
Tel.: (314) 241-4844 / Fax: (314) 241-3525

Robert J. Gralewski, Jr. (196410)
bgralewski@kmllp.com
Samantha L. Greenberg (327224)
sgreenberg@kmllp.com
KIRBY McINERNEY LLP
600 B Street, Suite 2110
San Diego, CA 92101
Tel.: (619) 784-1442

Karen Lerner**
klerner@kmllp.com
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

Dennis Stewart (99152)
dstewart@gustafsongluek.com
GUSTAFSON GLUEK PLLC
600 B Street
17th Floor
San Diego, CA 92101
Tel.: (619) 595-3299

Daniel E. Gustafson*
dgustafson@gustafsongluek.com
Daniel C. Hedlund*
dhedlund@gustafsongluek.com
Daniel J. Nordin*
dnordin@gustafsongluek.com
lwang@gustafsongluek.com
Ling S. Wang*
lwang@gustafsongluek.com
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel.: (612) 333-8844

*Pro Hac Vice (See Dkt. 50)
**Pro Hac Vice pending

Counsel for Publisher Plaintiffs

[Additional Counsel identified on signature pages]

**CONSOLIDATED CLASS ACTION COMPLAINT**

Case No. 5:20-cv-08984-BLF

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re GOOGLE DIGITAL PUBLISHER ANTITRUST LITIGATION | Case No. 5:20-cv-08984-BLF |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| | Judge:      Hon. Beth Labson Freeman |
| | Courtroom:  3, 5th Floor, San Jose |

1    Plaintiffs Genius Media Group, Inc., Sterling International Consulting Group,

2    Sweepstakes Today LLC, The Nation Company, L.P., The Progressive, Inc., JLaSalle Enterprises

3    LLC, and Mikula Web Solutions, Inc. ("Plaintiffs"), on behalf of themselves and all others

4    similarly situated, bring this class action, pursuant to Rule 23 of the Federal Rules of Civil

5    Procedure, against Defendants Alphabet Inc. ("Alphabet"), Google LLC ("Google"), and

6    YouTube, LLC ("YouTube") (collectively, "Defendants").   Plaintiffs seek treble damages and

7    injunctive relief for Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and

8    allege, based on personal knowledge as to acts and events taking place in their presence, on the

9    investigation of counsel, and on information and belief for all other allegations, as follows:

10                                   **INTRODUCTION**

11    1.    This case is about the future of online publishers such as Plaintiffs and proposed

12    Class members who produce and publish the websites that have become the driving source of

13    information throughout our society.   These publishers, ranging from news organizations, to niche

14    informational sites, to eclectic work-at-home bloggers, rely on online advertising revenue to fund

15    their businesses.   Their ability and incentive to create online content is being unlawfully

16    threatened by Google—a titan of the internet—whose advertising-related revenues have

17    exploded, over $145 billion in 2020, while publisher ad revenues have plummeted.

18    2.    The online advertising market is broken because of Google's past and ongoing

19    unlawful conduct directed at online publishers.   Plaintiffs bring this action to protect free market

20    competition from Google's continued unlawful manipulation, and to remedy harm to online

21    publishers that sell digital advertising space to advertisers.   That harm is the direct result of

22    Google's efforts to expand and maintain its dominance and control of publisher-provided online

23    advertising.

24    3.    While most-commonly known as a search engine, Google (including its parent

25    Alphabet Inc.) is a digital advertising behemoth, and the digital advertising services that Google

26    sells to publishers and advertisers generate a substantial portion of Google's revenue.   As

27    discussed below, Google has illegally exploited its unique opportunities for competitive

28    interference—derived from its control over the tools that connect publishers and advertisers—to

---

**CONSOLIDATED CLASS ACTION
COMPLAINT**                    1              Case No. 5:20-cv-08984-BLF

1    benefit its own business and to harm publishers.

2        4.      The unlawful anticompetitive conduct at the heart of this case occurs in the display

3    advertising marketplace, where publishers sell space on their websites to advertisers through real-

4    time auctions.   Through its campaign of anticompetitive conduct, Google has achieved and

5    maintained market and monopoly power in that marketplace by erecting a toll bridge between

6    publishers and advertisers, effectively mandating passage across that bridge for publishers

7    seeking access to advertisers, and extracting supracompetitive tolls.

8        5.      Plaintiffs and the proposed Classes are publishers who operate websites and seek

9    to sell space on their own websites to advertisers for the placement of digital display ads.  When

10   the viewer or user of a webpage loads and views the page, she provides the publisher with the

11   opportunity to populate that page with advertising targeted specifically to her, effectively

12   generating ad inventory on the publisher's site (known as "impressions").  This sets off a series

13   of processes that place digital ads on publishers' websites through what is called the "Ad Tech

14   Stack."  At the top of that stack is the publisher Ad Server—the software or code that publishers

15   use to evaluate advertising content—which connects the publisher to "Ad Exchanges" and/or "Ad

16   Networks."  Ad Exchanges are auction-like platforms where advertisers bid to place

17   advertisements on publishers' websites.  Ad Networks are platforms that match advertisers and

18   publishers, but which provide fewer features and target relatively smaller publishers than Ad

19   Exchanges.  Ad Exchanges and Ad Networks provide bids from their participating advertisers to

20   the publisher Ad Server.  Once a publisher's Ad Server identifies the winning bid, it selects the

21   winning advertisement from the advertiser's representatives in the Ad Tech Stack and places the

22   ad on the publisher's website.

23       6.      Google controls the publisher side of the Ad Tech Stack from top to bottom.

24   Google controls the primary tools and products used by publishers, including (1) the dominant

25   publisher Ad Server products (70-90% of the market), (2) the dominant Ad Exchange (more than

26   50% of the market), and (3) the dominant Ad Network (more than 50% of the market).  Google

27   also controls the dominant tools used by advertisers to bid on ad inventory (advertiser buying

28   tools) (70-90% of the market).

**CONSOLIDATED CLASS ACTION**              2                Case No. 5:20-cv-08984-BLF
**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7.      Google uses its dominance across these markets to prevent competition, charge supracompetitive prices, and stifle innovation.  Google performs every function in the digital advertising chain that connects publishers and advertisers, and Google controls access to the majority of advertising volume.  When publishers have tried to avoid Google's dominance, Google has promptly used its monopoly power to stamp out those efforts and prevent competition.

8.      Google has been able to maintain its dominance through exclusionary conduct because it is in the position of representing both sellers of display ad space (publishers like Plaintiffs and the proposed Classes) and those they sell to (advertisers), while also controlling the platforms through which both sides interact (the Ad Exchange or Ad Network that sets the auction and pricing rules).  As a result, Google has the incentive and ability to bias ad auction rules and prices in its own favor, which it has done for many years.  Google has unlawfully distorted the amounts ultimately received by the publishers (and the amount paid by advertisers), keeping a supracompetitive portion or "take" for itself as the all-important middleman.

9.      Google has the ability to accomplish this distortion because of its dominant publisher Ad Server—the software or code that publishers use to make critical decisions about what advertisements will be displayed on their websites—to impose anticompetitive rules and conduct that artificially warps the channels through which publishers sell their ad inventory, and disadvantages rival Ad Exchanges and Ad Networks.

10.     Publishers maximize revenue by offering their inventories to as many advertisers as possible; hence, publishers would prefer to deal with multiple Ad Exchanges.  The Ad Server selects the winning bid from among the competing Ad Exchanges and Ad Networks.  Generally speaking, and in the absence of Google's anticompetitive conduct, publisher Ad Servers would evaluate the bids from multiple channels simultaneously, accepting all bids from all Exchanges that exceeded the publisher's minimum threshold.  But Google has rigged the selection process by programming its market dominant Ad Server so that the winning bid from Google's Ad Exchange is more likely to succeed because Google affords that bid both first-in-line privilege and a "last look," giving Google's Ad Exchange the final opportunity to secure the impression by paying incrementally more than any rival Exchange.  This combination of first and last looks, has

1    enabled by Google's monopoly control over publisher ad serving, artificially and anti-
2    competitively distorted the Ad Server's bid selection process with the intent to exclude rival Ad
3    Exchanges as a means to maintain and expand Google's dominance in the Ad Exchange market.

4        11.    The result of Google's conduct throughout the Ad Tech Stack has been a vicious
5    cycle that has increasingly impaired competition and benefited only Google.  As Google's
6    publisher Ad Server stacked the deck in favor of Google's Ad Exchange, it drove more advertisers
7    to place bids through Google's Ad Exchange, because bids placed on that Exchange were more
8    likely to win than the same bid placed on a non-Google Exchange.  This exclusionary conduct, in
9    turn, drew publishers to prefer Google's Ad Exchange because it provided access to more bidders.
10   And because Google restricted access to its Ad Network and Ad Exchange products to publishers
11   using Google's Ad Server, publishers were compelled to use the Google Ad Server even though
12   its business rules enhanced Google's dominance and further impaired competition by favoring
13   Google's products.  This cycle of exclusionary conduct obtained, enhanced, maintained, and
14   reinforced Google's market and monopoly power in the publisher Ad Server, Ad Network, and
15   Ad Exchange markets.

16       12.    Attempting to avoid being totally at Google's mercy, and seeking to preserve at
17   least some level of competition, publishers and other market participants implemented "header
18   bidding"—a process that enabled *simultaneou*s bidding among competing Ad Exchanges—as a
19   more competitive means of selling their advertising inventory.  Header bidding effectively
20   allowed publishers to secure higher bids from rival, non-Google Ad Exchanges, thereby
21   circumventing the sequential bidding process that Google had rigged in its favor.

22       13.    Google reacted to the market-driven threat to its dominance by undertaking
23   another round of anticompetitive actions to use its monopoly power to ensure that it would retain
24   and expand its control over the Ad Exchange market.  Google did this by imposing Ad Server
25   rules that pushed publishers to Google's own services and impeded the ability of header bidding
26   to enhance competition on the merits or function as intended.  For example, Google used its
27   market power to slow down header bidding, while ensuring that Google had special opportunities
28   to take ad placement that otherwise would have been made through header bidding.  Google also

CONSOLIDATED CLASS ACTION          4          Case No. 5:20-cv-08984-BLF
COMPLAINT

started levying an explicit surcharge on the bids submitted by non-Google Ad Exchanges. The surcharge can run as much as 10 to 15 percent of a bid, and it takes the form of a deduction from non-Google Ad Exchange bids as they are entered into the bidding process. Because of this structure, the surcharge on bids from rival Ad Exchanges not only is an added cost to rivals but also enables Google's Ad Exchange to win auctions even when its advertiser is not the highest bidder, to the clear detriment of publishers.

14. Google even went beyond surcharging to maintain its market power by imposing uniform bidding floors that artificially prevent publishers from maximizing their revenues through competition. Google imposed these floors by modifying its publisher Ad Server product to preclude publishers from establishing differentiated minimum bid floors for Ad Exchanges as a way of encouraging more advertisers to utilize those rivals. When publishers tried to encourage more competition for the advertising space sold on their websites—*e.g.*, by allowing advertisers to submit lower bids through rival Ad Exchanges—Google programmed its publisher Ad Server to prevent it. By prohibiting bid discounting, the very essence of bid competition, Google has erected yet another anti-competitive and artificial barrier to rival Ad Exchanges, preventing publishers from pursuing revenue-maximizing strategies in the process.

15. Google has further tilted the Ad Exchange market in its favor by combining its publisher Ad Server and Ad Exchange products as a single product: Google Ad Manager. This fusion of two distinct products serving distinct roles in related but distinct markets is an unlawful tying arrangement. Publishers needing access to bids from Google's pool of advertisers through Google's Ad Exchange are also forced to use Google's Ad Server, while in turn, publishers using Google's Ad Server are locked into using Google's Ad Exchange. This conduct favors Google's Ad Exchange by creating vendor lock-in to a single, anticompetitive, Google-controlled marketplace, entrenching Google's monopoly power in the publisher Ad Server market and excluding rival Ad Exchanges and Ad Networks.

16. Google also directed anticompetitive conduct against the small- and medium-sized publishers that use Ad Networks, which act as intermediaries helping match those smaller publishers with advertisers. Google ties the use of its Ad Network, the Google Display Network,

to its Ad Server offerings (AdSense and Ad Manager).  Publishers, particularly the smaller publishers that rely on Ad Networks because their web traffic volume does not qualify them for Ad Exchanges, require access to Google's pool of advertisers through Google's Ad Network to sell their ad inventory.  By tying its Ad Network services for publishers to its Ad Servers, Google coerces publishers to use its Ad Server products.  Further, Google's dominance in the Ad Network and tied Ad Server offerings enables Google to extract an artificially high take rate from publishers that use Ad Networks to sell their inventory.

17.     In addition to the anticompetitive restraints listed above, Google has illegally used its monopoly and market power in additional ways to maintain its dominance in the Ad Server, Ad Network, and Ad Exchange markets, as well as to gain further dominance in related markets and further stamp out competition.  Substantial barriers to entry further assist in consolidating Google's market power and online dominance throughout the Ad Tech Stack.

18.     Google's conduct is not competition on the merits, but instead deliberately crafted anticompetitive conduct designed to maintain and enhance its market and monopoly power in the Ad Exchange and Ad Network markets or, alternatively, attempts to monopolize the Ad Exchange and Ad Network markets.  Individually and collectively, these unlawful acts deter innovation, exclude competition, and rob customers of quality products and their right to choose among competing alternatives.

19.     Google's unrivaled dominance in all of the relevant markets and Google's illegal conduct, as alleged herein, has been setting off alarm bells worldwide for many years.  In October 2020, following a year-long investigation, the United States Department of Justice filed a civil antitrust lawsuit to stop Google from unlawfully maintaining monopolies in the search and search advertising markets and to remedy the competitive harms.  In December 2020, a number of state attorneys general filed suit in Texas to remedy Google's unlawful conduct with respect to display advertising, challenging several of the practices at issue in this litigation.  These ongoing governmental investigations in the U.S. follow multiple antitrust inquiries worldwide, as well as antitrust-related penalties levied on Google by the European Commission, France, India, and Russia.

20.     The practices challenged herein harm publishers, advertisers, and innovative companies that have created—or, in a competitive market could create—alternative advertising services and platforms.  In the end, consumers lose: Publishers realizing lower advertising revenues produce less output, and have fewer resources available for investment in innovation and other means of providing better products and information to consumers.

21.     Plaintiffs thus bring this class action, alleging violations of Section 2 of the Sherman Act and of California's competition laws, arising out of Google's anticompetitive conduct aimed at publishers.  Plaintiffs seek relief for themselves and the proposed Classes to ensure that competition, not Google's anticompetitive rules and practices, governs the sale of online display advertising space on their websites through the publisher Ad Server, Ad Exchange, and Ad Network markets.  Left unrestrained, Google will continue to act to maintain and enhance its market and monopoly power throughout the Ad Tech Stack, allowing Google's excessive toll on publishers to continue unabated.  If Google is allowed to maintain that control, there is no end to Google's ability to charge publishers monopoly prices, suppress the revenues that publishers can get from selling display ad space on their websites, and thereby reduce the output and quality of content on the web.  Further, left unabated, Google will continue to have the power to decide which publishers live and which die.  Such an outcome cannot be permitted under federal and state antitrust laws.

## PARTIES

22.     Plaintiff Genius Media Group, Inc. is a Delaware corporation with its principal place of business at 92 Third Street, Brooklyn, New York 11231.  Established in 2009, Genius is a digital media company offering services such as the development and maintenance of a vast repository of annotated music lyrics, some of which are artist-supplied and many of which are transcribed and refined by a community of over two million Genius contributors.  Genius has approximately 25-million advertising impressions per day and has earned tens of millions of dollars in annual advertising revenue over the last four years.  Genius Media has used Google's publisher Ad Server and Ad Exchange products to sell the advertising space on its website.  Genius Media thus paid Google for Google's Ad Server and Ad Exchange products.  As a direct

1    result of Google's misconduct as alleged herein, during the Class Period, Genius Media paid

2    artificially inflated fees directly to Google and also received reduced advertising revenues as a

3    result of Google's misconduct and suffered economic damage and antitrust injury as a direct

4    result.

5          23.    Plaintiff Sterling International Consulting Group is a Delaware Corporation with

6    its principal place of business in Statesville, NC.  Sterling operates an ad-supported website that

7    uses Google's AdSense, a publisher Ad Server, to identify the creation of ad inventory, obtain

8    bids from the Google Display Network (Google's Ad Network), and fill the ad space on its

9    website.  Sterling thus paid Google to use Google's Ad Server and Ad Network products.  As a

10   direct result of Google's misconduct as alleged herein, during the Class Period, Sterling paid

11   artificially inflated fees directly to Google and also received reduced advertising revenues as a

12   result of Google's misconduct, and suffered economic damage and antitrust injury as a direct

13   result.

14         24.    Plaintiff Sweepstakes Today LLC Plaintiff Sweepstakes Today, LLC is a limited

15   liability corporation organized and existing under the laws of the State of Oklahoma, with its

16   principal place of business located at 2914 South 122nd East Avenue, Tulsa, Oklahoma 74129.

17   Since 2004, Sweepstakes Today has operated a website, Sweepstakestoday.com, that provides

18   online access to sweepstakes, contests, promotions, and drawings offered by large, well-known

19   companies and corporations.  Sweepstakes Today is an online publisher.  On its sweepstakes

20   website, it integrates and shows digital advertisements and generates revenue by displaying these

21   ads, including ads selected, placed and served or filled through Google's advertising and

22   publishing products and applications.  As a direct result of Google's misconduct as alleged herein,

23   during the Class Period, Sweepstakes Today paid artificially inflated fees directly to Google, and

24   also received reduced advertising revenues as a result of Google's misconduct, and suffered

25   economic damage and antitrust injury as a direct result.

26         25.    Plaintiff The Nation Company, LLC, is a limited liability corporation organized in

27   the state of New York, and having its principal place of business at 520 8th Avenue, 21st Floor,

28   New York, New York 10018.  The Nation used a Google publisher Ad Server product and used

1    and paid for, through a fee deduction from Google, a Google Ad Network product to sell space

2    on its website to advertisers during the Class Period, received reduced net revenues as a

3    consequence of Google's misconduct, and suffered economic damage and antitrust injury as a

4    direct result.  As a direct result of Google's misconduct as alleged herein, during the Class Period,

5    The Nation Company paid artificially inflated fees directly to Google, and also received reduced

6    advertising revenues as a result of Google's misconduct, and suffered economic damage and

7    antitrust injury as a direct result.

8           26.     Plaintiff The Progressive, Inc. is a non-profit organization organized in the state

9    of Wisconsin, and having its principal place of business at 30 W. Mifflin Street, Suite 703,

10   Madison, WI 53703.  The Progressive used a Google Ad Server product and used and paid for,

11   through a fee deduction by Google, a Google Ad Network product to sell space to advertisers on

12   its website during the Class Period, received reduced net revenues as a consequence of Google's

13   misconduct, and suffered economic damage and antitrust injury as a direct result.  As a direct

14   result of Google's misconduct as alleged herein, during the Class Period, The Progressive paid

15   artificially inflated fees directly to Google, and also received reduced advertising revenues as a

16   result of Google's misconduct, and suffered economic damage and antitrust injury as a direct

17   result.

18          27.     Plaintiff JLaSalle Enterprises LLC is a New York limited liability company with

19   its principal place of business in Bellmore, New York.  JLaSalle operates an ad-supported website

20   that uses Google's AdSense, a publisher Ad Server, to identify the creation of ad inventory, obtain

21   bids from the Google Display Network (Google's Ad Network), and fill the ad space on its

22   website.  JLaSalle thus paid Google to use Google's Ad Server and Ad Network products.  As a

23   direct result of Google's misconduct as alleged herein, during the Class Period, JLaSalle paid

24   artificially inflated fees directly to Google and also received reduced advertising revenues as a

25   result of Google's misconduct, and suffered economic damage and antitrust injury as a direct

26   result.

27          28.     Plaintiff Mikula Web Solutions, Inc. is a small business incorporated in

28   Pennsylvania, and having its principal place of business at 22 Charter Oak Court, Doylestown,

PA 18901.  Mikula Web Solutions operates one or more ad-supported websites that use Google's AdSense, a publisher Ad Server, to identify the creation of ad inventory, obtain bids from the Google Display Network (Google's Ad Network), and fill the ad space.  Mikula Web Solutions thus paid Google to use Google's Ad Server and Ad Network products.  As a direct result of Google's misconduct as alleged herein, Mikula Web Solutions paid artificially inflated fees directly to Google and also received reduced advertising revenues as a result of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

29.     Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Google is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a subsidiary of Defendant Alphabet.  Since 2006, Google has wholly owned and controlled YouTube.  Google is the alter ego and agent of Defendants Alphabet and YouTube, and the companies regularly combine and comingle their operations.  For example, Google and YouTube share user data from their respective websites, google.com and youtube.com, in order to create new content and personalized advertisements on both sites.

30.     Defendant Alphabet Inc.  is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Alphabet wholly owns and controls Defendants Google and YouTube.  Defendant Alphabet is the alter ego of Defendants Google and YouTube.  Google and YouTube direct all profit to, and report revenue through, Alphabet.  Defendant Alphabet is one of the top ten largest companies in the United States with more than $162 billion in annual revenue.  Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index.

31.     Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066.  YouTube is a wholly owned and controlled subsidiary of Defendant Google.  Defendant YouTube is the alter ego of Defendants Google and Alphabet.  Google and YouTube combine products for purposes of Google's AdWords advertising program, which allows an advertiser to determine that if a

person searches for a specific term on Google's search engine (*e.g.*, "financial advisor"), the advertiser can direct that the next time that user watches a video on YouTube that person will see an advertisement for financial advisory services.  Google has recently begun testing integrating links to its search engine within YouTube's search results.  According to YouTube's Terms of Service: "The entity providing the Service is Google LLC, a company operating under the laws of Delaware, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (referred to as 'YouTube', 'we', 'us', or 'our').  References to YouTube's 'Affiliates' in these terms means the other companies within the Alphabet Inc.  corporate group (now or in the future)."

32.     Collectively, Defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO.  Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google.  YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such.  Alphabet filed its 10-K and 10Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the defendants.  In fact, these statements expressly define Alphabet as "Alphabet Inc.  and its subsidiaries." *See, e.g.*, Alphabet Inc., Quarterly Report (Form 10-Q) (July 30, 2020), at 2.

33.     All three Defendants engage in interstate commerce and in activities substantially affecting interstate commerce including, without limitation, providing ad tech services to publishers based throughout the United States and globally.  Publishers, both foreign and domestic, use Google's ad tech services to sell space on their websites to advertisers to display digital ads, which are targeted at users across the United States.  Each Defendant deals with and earns revenue from publishers throughout the United States.

## JURISDICTION AND VENUE

34.     This action arises under Sections 2 and 15 of the Sherman Act, 15 U.S.C. §§ 2, 15 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

35.     This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

36.     This Court has personal jurisdiction over Defendants.  Google, Alphabet, and

1    YouTube each maintain their headquarters in California.

2        37.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

3    Antitrust Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  All Defendants

4    reside, transact business, are found, and have agents in this District.

5        38.    Defendants' acts were within the flow of, were intended to have, and did, in fact,

6    have a substantial effect on the interstate commerce of the United States.

7                              **FACTUAL ALLEGATIONS**

8    **I.    DIGITAL ADVERTISING**

9        39.    The Internet reaches billions of people around the world and serves as a virtual

10   marketplace for products, information, and ideas.  Given the number of online visitors, this is an

11   attractive forum for advertisers.  Growing revenues derived from the sales of online or digital

12   advertising space have driven the explosion of information available on the web since the first

13   banner ad was displayed in 1993.  Digital advertising is now the most rapidly growing segment

14   of the advertising business in the United States, accounting for more than half of all advertising

15   spending.

16       40.    Before the internet, companies wanting to advertise did so largely through print,

17   radio, and television.  Advertising then was sent to all consumers, regardless of their traits or

18   interests.  The internet has changed all that, through advertising that is increasingly finely targeted

19   to specific consumers who are more likely both to click on the ads and to ultimately buy the

20   advertised products or services.

21       41.    Online or digital advertising consists of marketing advertisements, which are

22   delivered through the Internet on both desktop and mobile devices.  Online advertising involves

23   the use of the Internet as a medium to obtain website traffic and target and deliver marketing

24   messages to the right users, customers, and consumers.  In most cases, the decision of which ad

25   is served/shown to the user is made in real time, in response to the search term entered by the user

26   (in the case of search advertising) or in response to information about likely characteristics of the

27   person viewing the advertisement (in the case of display advertising) or the context of the page

28   being viewed.

**CONSOLIDATED CLASS ACTION**          12          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

42.     Digital advertising takes several forms.  For example, advertisements can be targeted to consumers, *inter alia*, as text-based ads to appear with search engine query results ("search advertising"), as display ads appearing in-line in publishers' content such as blog posts or news articles ("display advertising"), or as ads in social media feeds.

**A.      Search Advertising**

43.     Search advertising comprises ads linked to a word or phrase (*e.g.*, "Goldendoodles" or "water sprinklers") that are triggered to display when a user types that word or phrase into a search engine.

44.     Advertisers value paid search ads because such ads are served to a user only after the user has made a query correlated with products or services related to the ad.  On Google's search engine platform, search ads typically appear at the top of the first page of results from a keyword search.  Google hosts search advertising on other platforms as well—notably Google Play, Google Maps, and third-party applications.

45.     Google has been dominant in the online search advertising market for roughly 17 years.  Collectively, Google's products account for approximately 73% of the search advertising market.

**B.      Display Advertising**

46.     Like search advertising, buying and selling display ads often involves real-time bidding.  Online advertising campaigns are run through various pieces of advertising technology, or "ad tech." One main piece is the "Ad Tech Stack," which refers to the series of companies and technologies on the Internet that places digital advertisements in front of the right user at the right time to maximize the chance for the ad to influence the user to take some desired action.  Today, the Ad Tech Stack facilitates the automated selling and buying of digital ad inventory on a large scale in real time, as described in more detail below.

47.     Unlike search advertising, which is triggered when a user expresses an interest in the product through a search inquiry, display advertising is designed to induce that interest by displaying ads on web pages likely to be frequented by potential customers.  Since display ads are shown to specific users as they view a web page on their computer or mobile device, it is

1    critical for the successful deployment of marketing spend for advertisers to have information

2    about each prospect.

3         **C.      The Interplay of Search and Display Advertising**

4         48.      Advertisers purchase one format or another to serve their different goals.  For

5    instance, advertisers may purchase search ads to reach consumers actively looking to make a

6    purchase by searching for a particular product or company.  By contrast, advertisers may purchase

7    display ads on a publisher's site to increase brand awareness or to market a product to a consumer

8    that put the product in her shopping cart but did not complete the purchase.

9         49.      Publishers, which operate websites and mobile applications, are necessarily

10   restricted in the types of ad formats they can sell.  A news website, for example, can generally

11   sell display ads alongside its news articles but cannot generally sell search ads to monetize the

12   same content.

13   **II.    HOW DIGITAL DISPLAY ADVERTISING WORKS**

14        50.      Publishers sell their ad inventory to advertisers either directly through their

15   marketing departments or indirectly through programmatic ad auctions.  Approximately two-

16   thirds of all online advertising dollars are spent via programmatic marketing.

17        51.      The act of displaying an advertisement to a user on a webpage is known as an

18   "impression." The value of an impression depends upon both the characteristics of the user who

19   is viewing the ad and the value of the real estate where it is embedded-that is, the content of the

20   publisher's webpage and the ad's location on that page.   Thus, the value of a publisher's

21   impression may be increased whenever an advertiser has additional information about the user.

22   The publishers who can deliver the most desirable impressions in terms of quality of both the

23   webpage and data on the user are able to charge more for space on their websites for

24   advertisements.

25        52.      Digital display advertising may be sold on the basis of impressions, clicks, or other

26   actions.  Cost per impression means that advertisers pay the publisher for the number of times

27   their ads are displayed as different users load the relevant webpage.  Cost per click means that the

28   advertiser pays the publishers each time users click on the ads.  Cost per action means the

**CONSOLIDATED CLASS ACTION**          14          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

1    advertiser pays the publisher if an action, such as a product purchase or a registration for a service,

2    results from a user's exposure to the advertising.

3        53.    Some large publishers with significant staffing and strong demand for their

4    inventory are able to sell a limited number of advertisements directly to advertisers (so-called

5    "direct-sold" ads).  However, even those publishers that sell space directly to advertisers cannot

6    always accurately predict how many spaces will be available for direct-sold ads because the

7    amount of inventory is dependent on the number of users who visit the publisher's website (as

8    well as other factors specific to the publishers' deals with advertisers, *e.g.*, specific criteria for

9    users who would be targeted with the ads).  Thus, selling inventory through programmatic or

10   automated ad auctions permits publishers to sell their "remnant inventory" that either does not

11   qualify for their direct-sold deals or where the programmatic placement would fetch a higher price

12   than the direct-sold ad deals.  Additionally, some publishers sell the entirety of their inventories

13   through programmatic ad auctions.  In sum, programmatic or automated ads are a critically

14   important source of advertising revenue for publishers.

15       54.    Advertisers that want to display their ads and publishers wishing to sell space on

16   their websites for the ads each have a familiar problem: finding each other.  As part of that process,

17   publishers need—in the blink of an eye—to determine what space on their websites is available

18   for advertisement and how much they want to charge, and then communicate that information to

19   advertisers—and ultimately decide which ads they are willing to host on their site.  Publisher Ad

20   Servers, Ad Exchanges, and Ad Networks enable publishers to accomplish these goals, most often

21   through automation.  This process—in which a user loads a webpage, the auction occurs for any

22   space for advertisement on that webpage, and the ad gets placed—is automatic (usually taking a

23   few hundred milliseconds).

24       55.    There are multiple ways for Ad Server, Ad Exchange, and Ad Network vendors to

25   extract value from each transaction.  For instance, Google may take a percentage of the fee that

26   the advertiser pays, passing on a smaller share to the publisher.  Google also uses surcharges,

27   added fees, and imposes periodic "flat" or "tiered" fees (such as several hundred thousand dollars

28   per year) in various circumstances through its Ad Server, Ad Exchange, and Ad Network

**CONSOLIDATED CLASS ACTION COMPLAINT**          15          Case No. 5:20-cv-08984-BLF

1    products.

2        56.    The funds flow in the ad tech marketplace is opaque, with individual publishers

3    and advertisers having only limited knowledge concerning the amount charged by a string of

4    intermediaries.  In the typical non-Google Ad Exchange transaction, an advertiser hires an ad

5    agency, which charges a fee, to handle its ad placements.  The ad agency utilizes an advertiser

6    buying tool, which charges a fee, to source inventory and place bids.  The advertiser buying tool

7    places bids on an Ad Exchange, which charges a fee.  When inventory is sold via auction on the

8    Exchange, the Ad Exchange pays the Publisher.  The Publisher knows the end amount it receives,

9    and may or may not know the transactional fee charged by the Ad Exchange, but has no

10   knowledge of the original amount paid by the advertiser, or the fees charged by other

11   intermediaries.

12       57.    When a publisher uses the Google Ad Server, it is paid by Google on every

13   transaction that uses Exchange Bidding, discussed further below in the section starting at

14   Paragraph 117.  Thus, even when a rival Ad Exchange wins an impression through an Exchange

15   Bidding auction, the rival exchange pays Google which then pays the Publisher.  Similarly, when

16   a publisher sells impressions through Google's Ad Network, it is once again Google which pays

17   the publisher.

18       **A.    The Relevant Participants in the Ad Tech Stack**

19       58.    Publishers use software, called an Ad Server, to make their impressions available

20   for sale.  The publisher's Ad Server:  (1) determines which ads to display on the publisher's

21   website based on collected user data and preferences across publishers; (2) solicits and organizes

22   bids from advertisers; (3) serves the ad to the user; and (4) collects and reports on additional data

23   such as impressions and clicks, which is used to determine the cost to the advertiser and the

24   amount of money paid to the publisher.  Google's Ad Server is and has been for some time the

25   dominant provider of publisher ad serving services.

26       59.    Ad Exchanges are platforms enabling publisher Ad Servers to offer their inventory

27   of impressions for sale, and advertisers to place bids on the impressions they wish to purchase.

28   Ad Exchanges match advertisers and publishers programmatically using virtually instantaneous

auctions known as "real-time bidding."

60.     The Ad Exchange is the middleman that takes a cut of the price reached by the publisher and advertiser.

61.     Smaller publishers with fewer page views and impressions than the Ad Exchange thresholds may use an Ad Network to sell their inventory of impressions.  An Ad Network is an aggregator that collects ad inventory from multiple publishers and sells it to advertisers.  Like Ad Exchanges, Ad Networks compete against one another on the basis of price for publisher inventory.

62.     When possible, the publisher's Ad Server will offer the same impression to multiple Ad Exchanges and Ad Networks in order to reach the broadest group of potential advertisers, thereby increasing publisher revenues.  However, Google's AdSense Ad Server, which ties the Ad Server and Ad Network products together, only offers the publisher's ad impression to the Google Display Network (Google's Ad Network).

63.     Thus, the publisher's view of the Ad Tech Stack looks like this:



*Figure 1:  The Ad Tech Stack*

64.     A key consideration for publishers in selecting a publisher Ad Server is what bids and what advertisers—and on what terms—the Ad Server can solicit from different sources.  Publishers want their Ad Server to access the largest number of advertisers including those willing to submit the highest bids.  Conversely, if a publisher Ad Server cannot access significant pools of advertisers, the publisher Ad Server cannot compete effectively in the market against Google's publisher Ad Server.  Because Google has such a large share of advertisers, and because Google restricts access to its advertising pool only to those using Google's publisher Ad Server, publishers have no choice but to use Google's publisher Ad Server.  And once the publisher is locked in to Google's Ad Server, Google ties its Ad Server with its Ad Network or Ad Exchange, thereby enhancing its monopoly power in both product markets.  Moreover, once a publisher

chooses a publisher Ad Server and embeds that technology in its website, there are high costs to publishers of switching Ad Servers because they become integral parts of publishers' websites.

**B.      How Online Display Ads Are Selected and Delivered**

65.     Ads are chosen and shown to users via a sequence of events, all completed in a second or less.  In order for an ad to be displayed to a user visiting a webpage, the publisher's Ad Server, the user's browser, or a combination of the two, reach out to Ad Exchanges and Ad Networks to request bids on the ad placement from interested advertisers.  These requests often contain information about the content the user is accessing, the user who is intending to visit the publisher's website, and the size and prominence of the space available for advertisement on the web page.  After the interested advertisers place their bids, each Ad Exchange selects the winning bid and transmits that bid to the publisher's Ad Server.

66.     At that point, the publisher's Ad Server may request bids from multiple Ad Exchanges, putting them in direct price competition with one another in a sort of "auction of auctions."  The Ad Server selects a winning bid from among the Ad Exchanges, and delivers the winning ad to the user's device.  However, as alleged below, Google uses its dominance of the Ad Server market to manipulate the results of these auctions, thereby ensuring that Google wins even where the publisher could get a better price from another Ad Exchange and thereby suppressing the price that Google pays publishers for publisher ad space.

**C.      Google Dominates All Levels of the Ad Tech Stack.**

67.     Google has expanded its offerings throughout the Ad Tech Stack so that today it controls digital advertising from top to bottom.  Google now controls virtually every part of the digital advertising chain.

68.     Once Google seized control over the Ad Tech Stack, it also shrouded the entire process of buying and selling ads in secrecy.  As a House Antitrust Report in 2020 recognized,

1  "this process lacks transparency."[1]

2       69.     Google withholds key information from publishers about its services, such as how

3  much their space sold for and how much Google keeps, making it difficult for market participants

4  to see the full extent of misconduct in Google's auction processes.

5       70.     Google's dominance of the publisher Ad Server market began in 2007, when

6  Google purchased DoubleClick, which then gave Google control of over 50% of the publisher Ad

7  Server market.   Since that purchase Google's power has grown through the conduct alleged

8  herein, to the point that Google achieved monopoly power in publisher Ad Servers, with an

9  estimated market share of 70-90%.

10      71.     Google has used its dominance in the publisher Ad Server market to become the

11 dominant display Ad Exchange.  Google's Ad Exchange (or "AdX") is Google's auction-based

12 system for premium websites to be paired with premium advertisers and has a market share of

13 50% or more.  The few rivals to Google's Ad Exchange—such as Rubicon and OpenX—have

14 market shares in the teens or single digits, and Google's current market share outstrips the

15 combined shares of the next six competitors.  Google's control over the publisher Ad Server

16 makes it a gatekeeper for publishers' revenues and puts Google in charge of publishers' critical

17 advertising and content decisions.

18      72.     Google is also the dominant display Ad Network (the "Google Display Network"),

19 with a market share of over 50%.  Because Google controls such a dominant pool of advertisers,

20 and its rivals have only fragmented shares, publishers must do business with Google in order to

21 participate meaningfully in the relevant markets.  Aware of that bind, Google only makes its Ad

22 Network available to publishers who use its Ad Server by tying its Ad Server with its Ad Network.

23

24

25

26 _____

27 [1] *Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations*,

   H. R. Subcomm.  on Antitrust, Com.  & Admin.  L.  of the Comm.  on the Judiciary (2020)

28 (hereinafter "House Antitrust Report") at 129–30.

**CONSOLIDATED CLASS ACTION**          19          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

73.    Today, Google stands as the dominant provider of tools to publishers at all levels of the Ad Tech Stack, with market power at each stage of that marketplace, with its market shares as shown below:





*Figure 2:  Google's Estimated Market Share at Each Level of the Ad Tech Stack*

**D.    Google's Significant Power on Both Sides of the Ad Exchange and Ad Network Markets is Compounded by Indirect Network Effects.**

74.    Ad Exchanges and Ad Networks are subject to indirect network effects.  This means that as the number of users on one side of the platform increases, because of Google's exclusionary conduct disadvantaging rival Ad Networks and Ad Exchanges, access to the platform becomes necessary to users on the other side of the platform.

75.    Thus, as the number of advertisers using Google's Ad Exchange has grown, giving rise to more potential bidders on impressions, more publishers are pushed to use Google's Ad Exchange.  Similarly, as the number of publishers offering impressions on Google's Ad Exchange has grown, increasing the inventory of impressions available on that Exchange, more advertisers are encouraged to use Google's Ad Exchange.  Each additional advertiser increases the importance of Google's Ad Exchange to all publishers using it.  Likewise, each additional publisher increases the importance of Google's Ad Exchange to all advertisers using it.

76.     These same indirect network effects are present in the Ad Network market as well. As greater numbers of advertisers purchase through an Ad Network, the more publishers are pushed to use that Ad Network.  Similarly, as the number of publishers selling inventory through an Ad Network increases (which increases the inventory of impressions), the more advertisers need to purchase inventory through that Ad Network (because it enhances their ability to reach audiences).  The Google Display Network, Google's Ad Network, reaches more user impressions and websites than any other display network, including over two million small online publishers globally, providing Google with unparalleled scale among small publishers.  Google also routes the bids of advertisers who use Google's advertiser buying tools (*e.g.*, Google Ads), comprising a substantial share of advertisers purchasing through Ad Networks, to the Google Display Network.

## III.    **GOOGLE'S UNLAWFUL CONDUCT**

77.     Google has market or monopoly power in each of the publisher Ad Server, Ad Exchange, and Ad Network markets.

78.     As described below, Google has engaged in a series of actions to obtain, maintain and enhance monopoly power, or to attempt to obtain monopoly power in the publisher Ad Server, Ad Exchange, and Ad Network markets, including: (1) anticompetitive acquisitions at each level of the Ad Tech Stack, including in the publisher Ad Server market; (2) excluding rival Ad Exchanges through the imposition of rules designed to ensure Google's Ad Exchange wins more bids, thereby impairing the ability of rival Ad Exchanges to compete; (3) taxing rival Ad Exchanges through Google's Open Bidding process, which also impairs the ability of rivals to compete; (4) using its monopoly power in all three markets to exclude and impair rivals and raising barriers to entry by combining two separate products that serve distinct functions, the publisher Ad Server and Ad Exchange, which constitutes illegal tying of Google's Ad Servers to its Ad Network; (5) using its monopoly power in all three markets to exclude and impair rival Ad Networks from competing for impressions; and (6) using its publisher Ad Server to impose rate structures that raise rivals' costs.

79.     Google has used this conduct to, maintain and enhance market dominance in the

1   publisher Ad Server, Ad Exchange, and Ad Network markets.

2       **A.      Google Engaged in a Series of Acquisitions to Gain a Foothold at Each Level**

3       **of the Ad Tech Stack.**

4       80.     Google commenced its scheme to dominate the Ad Tech Stack with a series of

5   acquisitions.  Google has steadily and systematically grown through acquisition of corollary ad

6   tech, web application, and online video platform companies.  Since its founding in 1998, Google

7   has acquired more than 227 companies, spending over $27 billion for its top 10 acquisitions.

8   Rather than growing organically, Google has grown through strategic acquisitions to yield

9   products, manpower, and patent portfolios that directly and indirectly feed its online advertising

10  business revenue.

11      81.     The first and most significant such acquisition was Google's 2007 purchase of

12  DoubleClick for $3.1 billion.  Google purchased DoubleClick as a means of entering the markets

13  for providing services within the Ad Tech Stack.  DoubleClick provided publisher Ad Server

14  services and operated the largest Ad Exchange.  The DoubleClick products formed the basis of

15  Google's ad tech offerings in ensuing years.  As Google's submission to the United States House

16  of Representative's Subcommittee on Antitrust, Commercial, and Administrative Law

17  acknowledged, prior to the DoubleClick acquisition, Google had "no meaningful presence" in the

18  Ad Tech Stack.  A July 2006 Google presentation suggested that, by acquiring DoubleClick,

19  Google could obtain "self-reinforcing benefits" for Google's planned digital ad "ecosystem."

20      82.     At the time of the Google's acquisition of DoubleClick, industry participants,

21  including publishers, raised concerns that Google could use DoubleClick's market power in Ad

22  Servers and its wealth of consumer tracking data to reduce competition throughout the online

23  advertising marketplace.   The Federal Trade Commission, which conducted a competition

24  assessment of the merger, observed the potential for future "unlawful tying or other

25  anticompetitive conduct." The FTC nevertheless permitted the merger to continue, over the

26  prescient dissent of a Commissioner who warned of the "troubling" likely effect that the merger

27  would have on "the evolution of the entire online advertising market—especially in light of

28  existing network effects, and the tremendous additional network effects the transaction will

generate." Another Commissioner, while concurring in the decision to close the investigation, noted "serious vertical competition issues raised by Google's proposed acquisition of DoubleClick."

83.     Ultimately, the FTC approved the merger, concluding that display advertising markets were "relatively nascent, dynamic and highly fragmented," and the DoubleClick acquisition did not threaten competition in the markets because other big companies appeared "to be well positioned to compete vigorously against Google."[2] However, as the New York Times recently reported, at least one of the FTC commissioners who voted to approve the merger has since expressed his regrets.  Specifically, William Kovacic told the New York Times, "If I knew in 2007 what I know now, I would have voted to challenge the DoubleClick acquisition."[3]

84.     Indeed, the DoubleClick acquisition was instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to DoubleClick software, Google also acquired relationships with web publishers, advertisers, and agencies, beating a host of other potential buyers like Microsoft to the acquisition.  DoubleClick has been enormously successful for Google, with roughly 80% of Alphabet's $162 billion in revenues in 2019 coming from its advertising business.

85.     When Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on Internet users via DoubleClick with the data collected throughout Google's ecosystem (*e.g.*, through Gmail, Search, etc.).  In 2016, however, Google reversed this commitment, and subsequently combined DoubleClick data with personal information collected through other Google services—effectively combining information from a

---

[2] *See* Statement of Federal Trade Commission Concerning Google/DoubleClick, *available at* https://www.ftc.gov/system/files/documents/public_statements/418081/071220googledc-commstmt.pdf.

[3] *See This Deal Helped Turn Google Into an Ad Powerhouse.  Is That a Problem?*, The New York Times (Sept.  21, 2020), *available at* https://www.nytimes.com/2020/09/21/technology/google-doubleclick-antitrust-ads.html.

1   user's personal identity with his or her location on Google Maps, information from Gmail, and his or

2   her search history, along with information from numerous other Google products

3       86.    Google followed its DoubleClick acquisition with additional ad tech properties,

4   including, but not limited to:

5           •   In November 2009, Google acquired AdMob, a company with technology for

6               serving ads in mobile apps, for $750 million.  Google now uses AdMob

7               technology to offer publisher Ad Server services in mobile apps.

8           •   In June 2011, Google acquired AdMeld, one of the largest supply-side

9               platforms, which Google integrated into its auction platforms.

10      87.    These and other acquisitions created and/or solidified Google's product offerings

11  in the Ad Tech Stack.

12  **B.    Google Impaired and Excluded Rival Ad Exchanges by Using Its Publisher**

13  **Ad Server to Manipulate Auction Processes to Preference Its Ad Exchange.**

14      88.    In the publisher Ad Server market, Google wields overwhelming monopoly power

15  and has a share of up to 90% of the market.  Google's control over this stage of the Ad Tech Stack

16  is particularly important because it is the publisher Ad Server that decides which advertisement

17  wins the right to be displayed on a publisher's webpage.  From at least 2010 to the present, Google

18  has used this favored position to preference its own Ad Exchange, and to disadvantage, impair,

19  and exclude competing Ad Exchanges.

20          **1.    The Waterfall System (Pre-2009)**

21      89.    Prior to 2009, Google's display ad auctions allowed publishers to prioritize their

22  sources of demand for advertising (from deals sold directly by the publishers and from auctions

23  through one or more Ad Exchanges) within Google's publisher Ad Server using a "waterfall"

24  sequence.

25      90.    Publishers could prioritize their ad sources based on how the publishers valued the

26  ad sources, with direct-sold deals (if any) typically having priority over auctioned ads.  The typical

27  auctions used a "second-price" auctioning mechanism.  Publishers would typically rank auction

28  sources based on estimated performance using historical yield data.

91.     Until recently, second-price auctions have been the norm in programmatic advertising.  In a second- price auction, the winner only pays $0.01 more than the second highest bid.  If Advertiser A bids $2.00 for an impression and Advertiser B bids $1.75, the auction clearing winning bid will be $1.76.  Second-price auctions incentivize advertisers to bid in accordance with the value they place on the impression because they know that they will only have to pay the amount needed to beat the next highest bidder irrespective of their bid amount, eliminating what is known as buyers' "remorse."  First-price auctions, on the other hand, create incentives for advertisers not to bid as high as they value the impression and instead focus on optimizing their bids to bid as low as possible but still win the auction.

92.     When ad inventory became available (*i.e.*, when a user loaded the publisher's page generating ad slots) and there was no direct deal ad eligible for placement, the Google publisher Ad Server selected the ad source in order of the publisher's assigned rankings, with the highest-ranked source having the opportunity to conduct an auction and present a winning bid for the ad slot above a reserve price.

93.     If that first auction sold the ad above the reserve, the auctioning process stopped there.  If the reserve price was not met, Google's publisher Ad Server would offer the next Ad Exchange in the waterfall the opportunity to bid at a lower reserve price, and the process repeated for additional ad sources, lowering the reserve price each time.

94.     Although this process helped publishers reduce the risk that ad inventory would not sell, it precluded Ad Exchange ad sources, notably including Google's rivals, from bidding against each other in real time.

95.     The Waterfall System failed to maximize revenues to publishers because it did not allow publishers to rank ad sources in the Waterfall in accordance with the ad sources' actual bids (instead relying only on estimated bids based on historic auction results), nor did it allow all interested advertisers to bid against each other in real time.

96.     These limitations both reduced publisher advertising dollar yields.  For example, if the publisher Ad Server's estimated bids for its second (or third, or fourth, or fifth, etc.) ad source were inaccurate and those advertisers would have valued the ad slots more (*i.e.*, bid higher

1  amounts) than the historic bid, publishers would lose out on the actual value placed on their

2  inventory, and would receive lower revenues as a result.

3      97.    Moreover, the sequential bid aspect of the Waterfall System prevented publishers

4  from securing higher bids that had a lower rank in the Waterfall.  As set forth in the figure below,

5  if the Waterfall System had two ad sources (Ad Exchanges) both running second-price auctions,

6  the publisher Ad Server would collect the bid from the first ad source using a reserve price (say

7  $5).  The auction clearing price may then be $5.01 and, because the reserve price was satisfied,

8  the first auction would place the ad.  However, if the second ad source's auction clearing price

9  would have been $6.01, the publisher effectively lost $1 for the ad placement due to the Waterfall

10  System because that second ad source never got the opportunity to bid.



*Figure 3:  Example Lost Opportunity Due to Google's Waterfall Conduct*

23      98.    The Waterfall System excluded rival Ad Exchanges and deprived publishers of the

24  opportunity to reach the entire universe of Ad Exchanges.  If an Ad Exchange with an early place

25  in the waterfall sequence produced a bid above the publisher's minimum acceptable price, that

26  early bid would win the impression—even if an Ad Exchange later in the waterfall sequence had

27  elicited a substantially higher bid.  This approach disadvantaged publishers and drove volume to

28  Google's Ad Exchange at the expense of Google's rivals, particularly as compared to what would

**CONSOLIDATED CLASS ACTION**          26          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

occur in a simultaneous auction, because advertisers that valued the slots the highest were not permitted to bid and thus publishers could not maximize revenues for their ad impressions.

99.    An additional issue created by the Waterfall System was slow-loading advertisements.  The process of conducting successive auctions sometimes took long enough that users often left a page before the advertisement loaded, creating issues with tracking ad performance and potentially causing the publisher's content to load more slowly and diminishing user experience.

### 2.    Dynamic Allocation (2009)

100.    Beginning in or around 2009, Google's publisher Ad Server began using a system called "Dynamic Allocation" as a supplement to the Waterfall System.

101.    With Dynamic Allocation, Google's publisher Ad Server gave Google's own Ad Exchange an advantage through a two-step process.  Initially, the publisher Ad Server conducted a Google Ad Exchange auction using the highest estimated bid from any ad source in the Waterfall System as the reserve price.  If Google's Ad Exchange auction beat that highest estimated price, Google placed the ad from its Ad Exchange auction as the winner, with no other ad source even given the opportunity to bid.  Rival Ad Exchanges were permitted to compete in a secondary Waterfall if, and only if, Google's Ad Exchange failed to beat the reserve price.

102.    The dynamic allocation system thus gave Google's Ad Exchange a privileged position as the default first ad source in the Waterfall System.  This first-in-line privilege, granted by Google's publisher Ad Server, effectively drove advertisers to use Google's Ad Exchange, at the expense of Google's Ad Exchange rivals, because advertisers knew that if they submitted the same bid on Google's Ad Exchange and on a competing Exchange, the bid on Google's Ad Exchange was more likely to win due to Google Ad Exchange's priority in the waterfall.  Thus, Google used its publisher Ad Server monopoly power to expand its Ad Exchange dominance.  In turn, Google's enhanced Ad Exchange dominance reinforced its publisher Ad Server dominance through network effects and feedback loop dynamics, as elaborated below at paragraph 123 *et seq.*

1    103.    Dynamic Allocation did nothing to address the inefficiencies of the Waterfall

2   System; rather, it capitalized on and reinforced those inefficiencies by imposing Google as the

3   default first ad source.

4                        **3.    Last Look (2014)**

5    104.    In 2014, Google coupled its Ad Exchange's first-in-line privilege with a new

6   feature called "Last Look," that changed the way in which bids were accepted by the Waterfall

7   System and allowed Google the opportunity to outbid other ad sources on every impression,

8   further disadvantaging rival ad exchanges.  The Google Ad Exchange would wait for other

9   exchanges to submit their bids before making its own, a dynamic that left Google always in a

10  position to outbid its rivals.  By having the "last look," Google's Ad Exchange could simply bid

11  $5.01 when the highest bid for a particular user from another exchange was $5.

12   105.    Combined with its pre-existing first-in-line privilege, Google's last look allowed

13  it to suppress the range of bids that publishers received from all ad sources.  Secure that its last

14  look would allow it to ultimately win any bid, Google's Ad Exchange could evaluate the

15  impression and confidently low-ball its initial bid.  The operator of the next exchange in the

16  waterfall was aware that it was bidding after Google's Ad Exchange and would only have an

17  opportunity to bid if Google's Ad Exchange bid did not meet the reserve the publisher had set.

18  Because Google was known to have an information advantage concerning users, and hence the

19  value of impressions, Google Ad Exchange's low-ball first-in-line bidding caused competing

20  exchanges to undervalue impressions and lower their own bids.  Over time, because the exchanges

21  bid at such low levels, it depressed the bids and payments to publishers, dramatically harming

22  publishers.  It also foreclosed competition because rival Ad Exchanges and Ad Networks did not

23  get a chance to bid on impressions offered through Google's Ad Exchange unless and until

24  Google had decided to forego the opportunity.

25                        **4.    Enhanced Dynamic Allocation (2014)**

26   106.    That same year, in 2014, Google implemented "Enhanced Dynamic Allocation,"

27  through which Google's Ad Exchange used an adjusted price from the highest value direct deal

28  the publisher had arranged as the reserve price for its own auction.

**CONSOLIDATED CLASS ACTION**          28          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

1    107.   Enhanced Dynamic Allocation conferred an even greater advantage on Google's

2    own Ad Exchange than the earlier version of dynamic allocation by allowing Google to prioritize

3    Google's Ad Exchange even ahead of publishers' direct-sold deals in the Waterfall System.

4    108.   Under this revised mechanism, non-Google Ad Exchanges would only have an

5    opportunity to bid if (1) Google's Ad Exchange failed to meet the reserve; (2) there was no direct

6    deal qualifying for the space; and (3) the publisher Ad Server reached the other Ad Exchange in

7    the Waterfall System.

8    109.   While this process created the potential to increase publisher revenues in the short

9    term (by selling incrementally higher-revenue programmatic ads over direct deals), overall, the

10   ultimate effect was to weaken publishers' direct sales channels and drive more advertisers to

11   programmatic channels, where Google could extract more profits through its higher take rate on

12   automated ad placement.

13                  **5.    Header Bidding (2015)**

14   110.   To address the inefficiencies and to redress the artificial barriers to competition

15   from rival exchanges created by Google's Waterfall System and Google's Dynamic Allocation

16   processes, publishers and ad tech competitors began to develop and implement a process known

17   as "header bidding." This system gave every ad buyer an equal chance to bid on the same

18   inventory at the same time, leading to direct competition between bidders, leveling the playing

19   field for rival Ad Exchanges, and ultimately generating more ad revenue for publishers.

20   111.   Header bidding sends ad requests to the publishers' ad sources who then submit

21   their bids simultaneously, avoiding the Waterfall System altogether.  With the Waterfall System,

22   once the publisher ad server identifies an ad source in the Waterfall that meets the reserve price,

23   the process is over.  Because header bidding involves all ad sources bidding simultaneously, it

24   allows the highest bidder to prevail, and thus is the only system consistent with full and fair

25   competition.

26   112.   But here, too, Google was unwilling to compete head-to-head with rival Ad

27   Exchanges after publishers began using heading bidding.  Google used its market dominant

28   publisher Ad Server to interfere with the mechanism its header bidding competitors used to handle

simultaneous bids, extending Google's "last look" advantage to this new environment. Specifically, Google made its Ad Exchange bid available in Google's publisher Ad Server only *after* the header bidding auction was complete, in effect nullifying the competition that header bidding provided.  Google thus again granted itself a last look anticompetitive advantage over its competitors—one not based on the merits and enabled solely by the gatekeeper role Google took for itself through its dominance of the Ad Server market.

113.    By retaining a last look, Google's Ad Exchange must only beat the header bidding clearing price.  Even though a header bidding advertiser would be willing to pay more than its winning bid, Google's last look results in a lower sale price because Google's winning bidder and the header bidding winner did not have to determine which would bid the highest in an auction between them.  For example, if the winning header bidding advertiser is willing to bid $2.50 but needs only $2.00 to clear the header bidding auction, Google's last-look advantage would allow Google's advertiser to win the auction at $2.01 rather than needing $2.51 to beat the price the header bidding winner was willing to pay.  As a result, Google continued to use its last look— which it was able to impose because of dominance in Ad Servers—to bid the lowest amount needed to beat the header bidding auction clearing price, rather than competing directly with the header bidding auction participants, all to the detriment of publishers, as illustrated on the following page.

//



*Figure 4:  Example Waterfall with $2.00 Bid Floor*

***Versus***



*Figure 5:  Header Bidding with $2.00 Bid Floor*

114.    Google further sought to blunt the competitive threat of header bidding through its design of Accelerated Mobile Pages ("AMP").  AMP was designed to render websites built on the framework with header bidding incompatible with its applications.  As a result, publishers could not utilize header bidding without being penalized for doing so (both financially and through the inability of users to see/reach their sites), which substantially removed the financial

1   benefit of competition on the merits that header bidding had provided to publishers.   More

2   recently, Google has introduced an AMP solution that allows client-side header bidding, but it

3   imposes strict limits on the number of ad sources allowed to participate in bidding and a time

4   constraint on response times from ad sources.

5        115.   Further, by reserving a last look for its Ad Exchange, Google drives more

6   advertisers to its Ad Exchange product because those advertisers know that Google's Ad

7   Exchange is more likely to take the transaction even if the same bid is placed across multiple Ad

8   Exchanges.  As a result, Google's last look drives advertisers to place more bids on Google's Ad

9   Exchange than on rival Ad Exchanges, artificially driving more market share to Google.

10        116.   Prior to Google's use of its monopoly power in the Publisher Ad Server market

11  to advantage itself and disadvantage its rivals, as alleged above, header bidding had enhanced

12  competition between Ad Exchanges and Ad Networks and led to substantial increases in

13  winning prices for impressions, by as much as 25–50% and in some cases up to 70%.  This

14  increase in impression prices for publishers under header bidding, which Google intentionally

15  squelched, is evidence of some of the harm publishers suffered by virtue of Google's use of its

16  monopoly power in the Ad Server market to reduce competition in the Ad Exchange and Ad

17  Network markets.

18        **C.    Google Uses "Open Bidding" to Tax its Competitors in a Classic Raising**

19            **Rivals' Costs Strategy.**

20        117.   In April 2018, Google went one step further to suppress the competitive benefits

21  of header bidding for publishers by launching its direct competitor header bidding, a system

22  conducted by its dominant publisher Ad Server under the name "Exchange Bidding with Dynamic

23  Allocation," later named "Open Bidding." Google used its publisher Ad Server to effectively

24  force Exchange Bidding on publishers by interfering with the JavaScript code that rival Ad

25  Exchanges had used to place advertisements through header bidding.

26        118.   Google introduced Exchange Bidding to prevent header bidding from undermining

27  Google's market dominance.  Exchange Bidding is a unified auction between bidders on rival Ad

28  Exchanges that is, in essence, a form of server-side header bidding.  Each time inventory is for

sale, with Exchange Bidding activated by the publisher through the publisher's ad server, the Google publisher Ad Server runs consecutive auctions as follows:

- First, Google conducts an internal second-price auction among advertisers using its Google Ads tool within to select the highest bidder.

- Second, the winning Google Ads bid competes with other ad sources in a second-price auction within Google's Ad Exchange.

- Third, Google conducts the Exchange Bidding auction, a final first-price auction where Google's Ad Exchange competes against rival Ad Exchanges.

119.   In that final auction, however, if the winning bidder of the Exchange Bidding auction uses a non-Google Ad Exchange, Google imposes an explicit 5–15% surcharge or tax on the winning bid.

120.   Google chose to structure and apply this surcharge to maximize its anticompetitive impact: by imposing it as part of the bidding process, as opposed to after-the-fact.  In other words, the tax operates to reduce the bid amount by 5–15%.  As a result, the surcharge has the intended effect of suppressing the amount that advertisers from competing Exchanges are shown to be bidding for an impression.  This structure has two consequences.  First, bids as input from Google's Ad Exchange (which do not incur the surcharge) can win auctions even if those bids are lower than those of the rival Ad Exchange absent the surcharge; in this way, the surcharge *both* drives more wins towards Google's Ad Exchange *and* suppresses the revenues publishers earn from winning bids.  Second, even when a rival Ad Exchange bidder wins an auction in spite of the surcharge, the publisher will receive less money for that impression than it otherwise would have received absent the surcharge.  Had Google's publisher Ad Server imposed the surcharge on winning bids from rival Ad Exchanges after-the-fact, Google would have had to bid against the full value of the rival Ad Exchange bid, and thus pay more to win the ad.  That would have resulted in more money for publishers and more wins by competing Ad Exchanges.

121.   For example, assume the surcharge is 10% and minimum bid increments are $0.05.

- **Scenario 1: Surcharge is imposed as part of the bid in the auction:** If Ad Exchange A has a winning bid of $1.00, it is entered into the publisher Ad

1        Server Open Bidding auction as $0.90, and Google's Ad Exchange must bid

2        at least $0.95 to win the auction.  If Google's Ad Exchange wins, the publisher

3        receives $0.95; if Ad Exchange A wins, the publisher receives $0.90.

4        • **Scenario 2: Surcharge is imposed after the auction:** If Ad Exchange A again

5        has a winning bid of $1.00, Google's Ad Exchange must now bid at least $1.05

6        to win.  If Google wins, the publisher receives $1.05; if Ad Exchange A wins,

7        the publisher receives $0.90.

8    122.   While publishers receive the same amount if a rival Ad Exchange wins under

9 either scenario, publishers receive significantly lower amounts when Google wins if the surcharge

10 is imposed as part of the bidding process (Scenario 1).  Moreover, structuring the surcharge as

11 part of the bid necessarily results in more winning bids by the Google Ad Exchange, and again

12 adds to Google's power in the Ad Exchange market literally at publishers' expense.  Google's

13 surcharge on rivals reduces competition in the Ad Exchange market, to the detriment of

14 publishers.  Ironically, Google imposes this tax through business rules imposed by its publisher

15 Ad Server—the very software product that purports to serve the interests of Google's publisher

16 clients.

17    **D.   Google Has Combined its Publisher Ad Server and Ad Exchange Products**

18        **Under Ad Manager, Further Excluding Rivals and Raising Barriers to Entry.**

19    123.   Google further responded to competition from header bidding by locking critical

20 Ad Exchange functionality into its publisher Ad Server and ultimately marketing and selling both

21 products under a single product name, Google Ad Manager.  Google's combination of the two

22 products into one further pushes publishers into Google's Ad Exchange because Google has

23 locked advertisers behind its Ad Manager product.  The market's network effects then create a

24 feedback loop: those additional publishers make Google's Ad Exchange even more necessary to

25 advertisers, which in turn entices more publishers to install Google's publisher Ad Server.  The

26 more transactions that Google's publisher Ad Server sends to its Ad Exchange, the more

27 surcharges Google is able to impose on its Ad Exchange rivals, thereby continuing to build its

28 share and dominance in the Ad Exchange market.  The tying of these two products together as

1    one substantially forecloses rival Ad Exchanges by subjecting them to ever more surcharging by

2    Google.

3         124.    In order to reach a significant portion of Google's large stable of advertisers,

4    publishers have no realistic alternative but to place their impressions on the Google Ad Exchange.

5    In order to do so, publishers are compelled, through Google's tying arrangements to use the

6    Google publisher Ad Server under the Ad Manager umbrella.  The new Ad Manager serves as the

7    latest nail in the coffin for any competing publisher Ad Server, or for any potential entrant into

8    the publisher Ad Server market, further maintaining Google's existing monopoly power in the

9    publisher Ad Server market.

10        125.    Having compelled the use of both the publisher Ad Server and Ad Exchange by

11   publishers that might want only one or the other, Google has maintained, strengthened, and

12   expanded its dominance in *both* markets, thereby enhancing Google's power through other

13   challenged anticompetitive conduct, such as surcharging rivals and misusing the publisher Ad

14   Server to steal auction wins from its Ad Exchange competitors, to foreclose competition.

15        126.    Forcing Google's Ad Exchange customers to use Google's publisher Ad Server,

16   and *vice versa*, raises additional barriers to entry in the relevant markets that already posed a high

17   bar given Google's massive stable of advertisers.  Google's conduct has both the goal and effect

18   of gaining control over the entire range of Ad Tech Stack products, squelching innovation, and

19   locking publishers into a Google-controlled network—all of which allows Google to extract more

20   revenue from publishers.

21        127.    Microsoft used similar anticompetitive strategies in the 1990s.  For example,

22   Microsoft correctly recognized that the web browser could displace the operating system as the

23   most important computer interface.  The web browser is an application that sits on top of a "stack"

24   or layers of software, with the operating system at its foundation.  Microsoft used its Windows

25   operating system monopoly to force consumers to install, load, and use Internet Explorer instead

26   of a rival web browser.  By so doing, Microsoft was both expanding its monopoly "upward" in

27   the stack—from the operating system into web browsers—and maintaining its operating system

28   monopoly by making the web browser dependent on Windows.  Similarly, Google seeks to

**CONSOLIDATED CLASS ACTION**          35          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

1  maintain and expand control throughout the entire advertising technology stack (including the

2  publisher Ad Server and Ad Exchange/Ad Network markets) by forcing its publisher Ad Server

3  and Ad Exchange or Ad Network products together.  Google, like Microsoft before it, is thereby

4  squelching innovation and locking its users into a Google-controlled system from top to bottom.

5      128.  Google ties its AdSense Ad Server product with its Ad Network (the Google

6  Display Network).  Google does so by requiring publishers who seek access to advertisers that

7  purchase advertising space through the Google Display Network to use a Google Ad Server.

8      129.  As set forth below, the Ad Server and Ad Network markets are distinct products

9  situated within distinct markets.  For publishers whose traffic volume does not reach the Ad

10  Exchange thresholds, they must purchase services in both the Ad Server market (to identify the

11  creation of ad inventory and facilitate placement of advertisements) and the Ad Network market

12  (to sell their ad inventory identified by the Ad Server).

13      130.  As set forth above, Google has market and monopoly power in the Ad Network

14  market through its offering, the Google Display Network.  The Google Display Network has a

15  substantial market share in the Ad Network market (in excess of 50%) with potential rivals being

16  small and fragmented.  Thus, rational publishers selling ad inventory through Ad Networks must

17  have access to the substantial pool of advertiser demand that Google's Ad Network represents.

18      131.  Publishers therefore need Google's Ad Server products (AdSense and Ad

19  Manager) as tools to sell their advertising inventory through Ad Networks.  Smaller publishers

20  are the primary providers of ad inventory sold through Ad Networks.  Because of their size, small

21  publishers cannot access Ad Exchanges.  Further, smaller publishers also primarily use Google's

22  AdSense Ad Server because Google's Ad Manager Ad Server product requires complex

23  configurations that are not important to small publishers and impose unnecessary costs on them

24  with little offsetting benefit.  Because of Google's tie, Google's AdSense Ad Server connects

25  exclusively to Google's Ad Network and blocks access to rival Ad Networks or Ad Exchanges.

26  AdSense thus constitutes an illegal tie of its Ad Server product to the Google Display Network.

27      132.  Through this conduct, Google effectively coerces publishers to use Google's Ad

28  Server product, principally AdSense, because it is the only means by which publishers can gain

access to Google's market dominant pool of advertisers through the Google Display Network.

133.    This tying arrangement is extremely effective.  Google's Ad Server offerings—which are the only means of accessing the demand flowing through Google's Ad Network—have a dominant market share (over 80%).  Further, Google's dominance over small publishers that rely on the Google Display Network (because their traffic volume does not qualify for Google's Ad Exchange) allows Google to extract an artificially high take rate directly from publishers for selling those publishers' ad inventories.

134.    Google's Ad Server dominance then reinforces its market power in the Ad Network market.  Indeed, for advertisers to reach publishers' ad inventory who use the AdSense Ad Server, such advertisers must purchase advertising through the Google Display Network.  Because the AdSense Ad Server has a dominant share of such publishers and such publishers' inventory is only available to advertisers through the Google Display Network, Google is able to, and does, amass and retain a substantial pool of advertisers purchasing through the Google Display Network.

135.    Google also uses its control over large publishers, gained through the conduct alleged herein, to reinforce its control over advertisers in its Ad Network and, necessarily, its control over small- and medium-sized publishers using AdSense.  By using its Ad Manager to exclude or impair competition from non-Google sources of advertising demand (*e.g.*, non-Google Ad Exchanges and Ad Networks), including by preventing bidding from non-Google advertising clients on equal terms for Google's larger publisher clients' inventories, Google impairs competing Ad Exchanges and Ad Networks in their ability to win auctions for larger publisher ad inventory.  This conduct, in turn, impairs those actual or potential competing Ad Exchanges and Ad Networks from acquiring or maintaining (much less growing) their pools of advertising demand.  Further, as a result of the conduct alleged herein, those potential competing Ad Networks and Ad Exchanges are unable to provide publishers with advertising demand comparable to Google, and thus none is able to replace the Google Display Network's function for small- and medium-sized publishers, which further locks those publishers into Google's AdSense due to Google's tying or *Microsoft*-like anticompetitive bundling strategy.

136.    As a result of the conduct alleged above, Google is able to overcharge AdSense customers for Google's Ad Server and Ad Network services because such smaller publishers have nowhere else to turn.

**E.      Google Excludes Rival Ad Networks Under the Guise of Policing Malicious Code.**

137.    Ad Networks act as intermediaries, helping to match advertisers with small and medium-sized publishers whose page views are not high enough to allow them to offer their advertising inventory directly on the more sophisticated Ad Exchange marketplaces.

138.    Under the false pretext of controlling problematic code, Google's publisher Ad Server excluded rival Ad Networks from competing for impressions, thereby driving more business to the Google Ad Network and diminishing publisher revenues.  Google's publisher Ad Server informed the publisher and the rival Ad Network that there was a problem with the rival Ad Network's code.  The Ad Server removed the rival Ad Network's code, which effectively precluded the rival from competing for the publisher's impressions.  The rival Ad Network was then forced to resubmit the same code to the publisher's Ad Server, which required extensive work and hours of labor by staff at both the rival Ad Network and the publisher, and jeopardized the rival Ad Network's business relationship with the affected publisher.  Moreover, while this work was in process, the rival Ad Network was not permitted to compete for that publisher's impressions in the Google publisher Ad Server.

139.    This recurring practice, instituted by the Google publisher Ad Server, injured rival Ad Networks by imposing unnecessary additional costs on publishers seeking to use the rival Ad Networks in conjunction with their Google Ad Server.  Publishers were injured, in part, because impaired rivals included Ad Networks that paid more for the same inventory than Google's Ad Network was willing to offer.  Through its anticompetitive conduct, Google has used its monopoly power in publisher Ad Servers to monopolize or attempt to monopolize the Ad Network market, and as with Google's conduct in the Ad Exchange market, the impacts of these acts are exacerbated by indirect network effects.

1    **F.    Google Uses Its Publisher Ad Server to Impose Rate Structures that Raise**

2    **Rivals' Costs.**

3        140.    In addition to the surcharge on rival Ad Exchanges discussed above, Google uses

4    its publisher Ad Server to raise its rivals' costs in other ways.  Through Google Ad Manager,

5    Google imposes a rate structure that lowers publishers' revenues if an advertisement is placed

6    using a rival Ad Network or Ad Exchange under certain circumstances.

7        141.    For instance, Google's publisher Ad Server may impose an "Audience" fee that is

8    as much as 100% higher when advertisements are placed through a non-Google Ad Network or

9    Ad Exchange (*e.g.*, a 5-cent fee for a certain number of Google-placed advertisements, but a 10-

10   cent fee for the same number of competitor-placed advertisements).  Google deploys other fee

11   structures that achieve a similar economic effect by "including" a certain number of Google-

12   placed advertisements at certain price tiers, while "excluding" non-Google-placed advertisements

13   so that publishers incur additional fees when they do business with a competitor.

14       142.    Google's course of conduct is designed to force publishers to deal exclusively with

15   Google and punish those who do not.  Google's conduct has the purpose and effect of making it

16   uneconomical to use a rival Ad Exchange or rival Ad Network, thereby coercing publishers to

17   exclusively use Google's publisher Ad Server and Ad Exchange.  Put differently, Google

18   punishes customers who choose not to deal exclusively with Google.

19       143.    Google's surcharges and discriminatory rate structures make it uneconomical for

20   publishers to substitute a rival publisher Ad Server, Ad Exchange, or Ad Network.  Because

21   Google's surcharges and rate structures cannot be supported by legitimate business justifications,

22   they serve no purpose but to keep publishers locked into Google's advertising products by

23   penalizing customers who attempt to substitute a rival product.

24       144.    Google's Ad Manager conduct serves the same end because, by compelling

25   publishers who need access to Google's dominant Ad Exchange or Ad Network to use Google's

26   publisher Ad Server, Google punishes publishers who attempt to use rivals' products by

27   increasing the cost of doing so.

28

1

**G.**     **Google Uses Its Publisher Ad Server to Raise Rivals' Costs by Degrading the**

2

**Transaction-Related Data Provided to Transaction Participants.**

3        145.    In the online display advertising market, the value of an impression can be heavily

4   affected by the extent and nature of information available about the viewer or user of the

5   publisher's webpage, including any characteristics or known preferences that might make that

6   user more likely to purchase a particular product or service.

7        146.    The online display advertising market is characterized by information asymmetry.

8   A user's identity may be linked to their email address, their mobile phone number, the IP address

9   of their home or work desktop, or the IMEI identifier of their mobile device.

10       147.    Moreover, participants in the online display marketplace gain information about

11   users in a variety of ways.  Publishers may learn about user preferences based on information

12   users provide the publisher and the content they access.  Google learns about user preferences

13   through their search history and through their browsing history on the Google-owned Chrome

14   browser.  A number of participants and data brokers also sell, share, and otherwise exchange

15   pertinent information about users and publishers to other marketplace participants.

16       148.    Of particular importance, all participants in the marketplace, publishers,

17   advertisers, and their intermediaries, Ad Networks and Ad Exchanges, learn about viewer

18   preference through the viewer's interaction with advertisements, *i.e.*, which ads they click on to

19   learn about a product, which products they actually purchase as reflected in attribution statistics,

20   and which ads they ignore.  In a competitive market, all of the information that is associated with

21   a transaction is ordinarily available to all transaction participants.  Of particular importance,

22   publishers can use their Ad Server tool to provide their proprietary user information to the

23   intermediary Ad Exchanges and Ad Networks on which the publisher offers its impressions.

24       149.    When an impression is made available for purchase through an Ad Network or Ad

25   Exchange, both the publisher, via its Ad Server, and the intermediary Ad Network or Ad

26   Exchange will provide substantive information about the user in order to inform advertisers.

27   When more information is made available, a broader range of advertisers will be interested in

28   purchasing the impression, and the impression will be more valuable.  As a result, in order to

**CONSOLIDATED CLASS ACTION**          40          Case No. 5:20-cv-08984-BLF
**COMPLAINT**

effectively compete in the online advertising marketplace, both publishers and intermediaries seek to maximize the amount and quality of information they have about users.

150.    Moreover, because information about users is asymmetrically available, publishers will maximize the value of their impressions not only by reaching the greatest number of advertisers, but by offering their impression through the largest number of intermediaries, Ad Networks and Ad Exchanges, because each of these intermediaries may offer distinct and different information about the user.

151.    For example, assume User John Smith is reading the New York Times webpage on Travel.  The New York Times knows that John Smith is 35, that he reads articles about outdoor sports, financial markets, environmental concerns, and wellness.  The New York Times offers John Smith's impression for sale on Google's Ad Exchange, on Rival Ad Exchange1, and on Rival Ad Exchange2.  Google's Ad Exchange knows that John Smith has also expressed an interest in backpacks, throwback hockey jerseys, and Asian cuisine.  Rival Ad Exchange1 has previously auctioned a John Smith impression, and so knows that he bought a kayak—a fact unknown to Google's Ad Exchange.  Rival Ad Exchange2 has never encountered John Smith before, so it has no additional information to add to the transaction.  Advertiser Premium Paddle Boards accesses John Smith's impression via all three exchanges.  While Google has more information to add to the transaction than either of its competitors, the information provided by Rival Exchange1 that John Smith has previously purchased a kayak makes it much more likely that he is going to purchase a paddle board as well, so Premium Paddle Boards submits a bid substantially higher than those submitted by other advertisers, and wins the impression.

152.    As this example illustrates, transactional data involving users is key to the online marketplace.  Knowing what ads users have been shown, what ads they have ignored, what ads they have read, and what ads have actually led to a purchase provides significant information that makes a given impression more valuable to a wider range of advertisers.  Moreover, a publisher will maximize the value of its impressions by offering those impressions through as many Ad Exchanges and Ad Networks as possible, because each of those intermediaries could potentially provide information about the user that makes the impression much more valuable to a given

1    advertiser.

2          153.   Through a variety of actions, Google has raised rivals' costs by denigrating the

3    transactional information available to publishers and rival intermediaries in the online advertising

4    marketplace.  Limiting the transactional information available to rival intermediaries raises their

5    costs because user information is one of the most valuable inputs the intermediary can offer a

6    publisher.  If rival Ad Networks and Ad Exchanges are limited in the user information they can

7    obtain from transactions, they will have to purchase user information elsewhere.  Limiting the

8    transactional information available to publishers raises the costs of rival Ad Networks and Ad

9    Exchanges because publisher information is a surrogate for the intermediary's information; the

10   more user information the publisher possesses, the less dependent the publisher is on the

11   information provided by intermediaries, and the more rival intermediaries can compete on the

12   basis of other factors like cost, speed, service.

13         154.   Google's efforts to degrade the transactional information available to publishers

14   and to rival Ad Networks and Ad Exchanges has taken a variety of forms.  Initially, when Google

15   purchased DoubleClick for Publishers, a consistent user identifier was provided to both

16   advertisers and publishers, which allowed them to independently aggregate information about the

17   user without needing the intermediary.  Google degraded the information available to others in

18   the market, preserving complete information only for itself, by hashing user identifiers and

19   providing different identifiers for the same user to the advertiser, on the one hand, and the

20   publisher on the other.  Google likewise denies publishers user and transactional information

21   when impressions are placed on a publisher's AMP page, a fast-loading news page that is part of

22   the Google news carousel, because AMP pages are both cached and served by Google.  Google's

23   plan to eliminate third-party cookies on the Chrome browser will preclude publishers from

24   tracking their users to other sites for purposes of ad attribution, even when the publishers have

25   obtained their users' consent to do so.  It will also erode the capacity of third-party data entities

26   to provide rival Ad Networks and Ad Exchanges with information needed to compete with Google

27   in that space.

28         155.   Google's actions have had the intended effect of raising the costs of rival Ad

Networks and Ad Exchanges by denigrating the quality and extent of user information that would otherwise be available in the marketplace.  Google's actions are made possible through its control of the publisher Ad Server, through its monopoly power in search, and its monopoly power in the browser market.

156.    Distinct from user information, post-transactional information helps publishers to evaluate competing intermediaries in the market and aids Ad Exchanges in developing strategies to help both its advertiser and publisher clients.  Post-transactional information is the information regarding the consummated sale of the impression, and can include, without limitation, the winning bid price, the bids placed by each competing ad exchange, and whether the serving of the impression resulted in a user click or purchase.

157.    Most recently, in the context of Exchange Bidding, Google has limited the post-transactional information available to publishers, refusing to provide the publisher with the individual bids offered by rival exchanges—key information that allows the publisher to evaluate rival Ad Exchanges and compare them to Google's Ad Exchange.  Rival Ad Exchanges submitting bids to the publisher Ad Server as part of Google's Exchange Bidding also suffer a degradation of transactional information, receiving less information about the transaction than they had obtained through the header bidding process.  This Google-created opacity reduces market efficiency and makes it difficult to detect Google's bid manipulation because knowing only the winning bid does not disclose whether it was also the high bid.  Google's conduct also raises barriers to entry and impedes data analytics and innovation from rival vendors.

## IV.    THE RELEVANT MARKETS

158.    This case focuses on the markets for three products: publisher Ad Servers, Ad Exchanges, and Ad Networks.

159.    Google has market or monopoly power in each of the relevant product markets.

160.    Publisher Ad Servers are the means and "decision engine" for determining which advertisements to display.  They are the inventory management systems that publishers use to holistically manage their online display advertising inventory—the image-based graphical ads alongside web content—impose and administer the rules for offering advertising impressions for

sale, and selecting which ad to display.  Publisher Ad Servers provide features such as: (1) the ability to solicit and organize bids from sources of advertising demand (*i.e.*, direct-sold ads, Ad Exchanges, and Ad Networks); (2) reservation-based sales technology to support a publisher's direct sales efforts; (3) inventory forecasting technology to help a publisher determine what inventory will be available to sell; (4) a user interface through which a publisher's sales team can input directly sold campaign requirements; (5) co-management of direct and indirect sales channels; (6) report generation of ad inventory performance; (7) invoicing capabilities for a publisher's direct campaigns; and (8) yield management technology.

161.    In the market for publisher Ad Servers, publishers purchase the Ad Server services from providers, such as Google.  No other service is substitutable for, or reasonably interchangeable with, an Ad Server from the perspective of publishers.

162.    In other words, if a hypothetical entity with monopoly power in the Ad Server market imposed a small but significant non-transitory increase in price for its publisher Ad Server, sufficient publishers would not replace the Ad Server function with another product or service so as to make the price increase unprofitable.

163.    Ad Exchanges match two different categories of customers (advertisers and publishers).  They provide a service like a clearinghouse or auction house that is distinct from the publisher Ad Server product, which connects publishers to the Ad Exchanges and Ad Networks and which controls whether and how certain advertising content is delivered from the publisher's website and displayed to the website's viewer

164.    If a hypothetical entity with monopoly power with respect to Ad Exchanges implemented a small but significant increase in the price it would not cause a sufficient number of publishers to switch to another product so as to cause that price increase to be unprofitable.  No other product or service provide a real-time auction marketplace with the unique features and access to advertising demand that Ad Exchanges do.

165.    Ad Exchanges are also not reasonably interchangeable with direct ad sales channels.  Selling digital display ad inventory directly requires publishers to invest substantially in managing, selling, and serving online ad campaigns, which is an expensive proposition for

1   publishers.  Similarly, direct sales channels do not access the same pool of advertisers as Ad

2   Exchanges because buying inventory directly from publishers also requires advertisers to invest

3   in and maintain internal staff to manage the direct ad purchases.  As a result, the direct sales

4   channel features only the highest-value publisher-advertiser transactions.  Moreover, the direct

5   sales channel functions as a complement to Ad Exchanges for those publishers and advertisers

6   large enough to engage in those transactions, with Ad Exchanges filling the publishers' inventory

7   not otherwise sold through the direct sales channel.  Thus, a small but significant non-transitory

8   increase in the price of Ad Exchanges would not cause sufficient publishers to switch to direct

9   sales to make the price increase unprofitable.

10        166.   Ad Networks offer fewer services than Ad Exchanges and are a separate product

11   market serving a different group of customers (typically smaller publishers with lower web

12   traffic).  Rather than providing all the targeting and bidding features of Ad Exchanges, Ad

13   Network placements are made based on a pool of advertising inventory.  Because they do not

14   have the sophisticated targeting and bidding features inherent in Ad Exchanges, Ad Networks

15   largely cater to smaller publishers and smaller advertisers as compared with Ad Exchanges.

16        167.   Similarly, Ad Networks are not reasonably interchangeable with publisher Ad

17   Servers or advertiser buying tools for large or small advertisers.  As set forth above, publisher Ad

18   Servers primarily identify the creation of ad inventory on publishers' websites and solicit bids to

19   fill that inventory.  Ad Networks are one place Ad Servers may turn to fill that inventory.  Thus,

20   Ad Networks and Ad Exchanges perform different, but related functions.  Advertiser buying tools

21   are not substitutable for Ad Networks from the perspective of publishers because advertiser

22   buying tools serve different customers (advertisers) and perform a different function, working to

23   facilitate advertisers' purchases in Ad Exchanges.  Therefore, a small but significant non-

24   transitory increase in the price of a hypothetical monopolist's Ad Network's services would not

25   cause a sufficient number of publishers to switch to an Ad Exchange, Ad Server, or an advertiser

26   buying tool, to make that price increase unprofitable because none of those other products

27   provides publishers using Ad Networks with reasonably comparable services.

28        168.   Each of the three foregoing separate product markets (publisher Ad Servers, Ad

Exchanges, and Ad Networks) make up a larger ecosystem, or what the industry calls "display advertising"—as opposed to video advertising or search advertising, which use different technologies that are not substitutable with the technologies publishers use for their display advertising across the internet.

169.   Display advertising comprises two channels: owned-and-operated platforms and what is referred to as "open display advertising."   The owned-and-operated channel consists of social media platforms like Facebook and e-commerce giant Amazon, which are each vertically integrated in that they sell their own advertising inventory directly to advertisers through propriety, integrated interfaces referred to in the industry as "walled gardens."  Google, however, operates not just in such an isolated space, but instead has created advertising tools and advertising exchange services for both third party publishers and advertisers in the open display advertising marketplace.   Owned-and-operated platforms and the open display advertising marketplace are not reasonable substitutes for each other and are not viewed as such by advertisers or publishers.

170.   Google has a dominant share of the publisher Ad Server market, likely in the range of 70–90% (if not more).   Indeed, the United Kingdom's Competition & Markets Authority ("CMA") (the U.K.'s antitrust authority) found that Google had between 90% and 100% of the publisher Ad Server market, as measured by the money advertisers paid to place ads within U.K. publishers' content.[4]

171.   Other than Google, the other sellers in the publisher Ad Server market are small and fragmented.  Indeed, since 2012, Google's closest competitors have either exited the market entirely or have been relegated to negligible market shares.

172.   Google has also market or monopoly power in the Ad Exchange market, where it controls approximately 50% of the market, and the Ad Network market, where it controls approximately 50% of the market.

---

[4] *See* Online Platforms and Digital Advertising, Market Study Final Report (July 2020), *available at* https://assets.publishing.service.gov.uk/media/5fa557668fa8f5788db46efc/Final_ report_Digital_ALT_TEXT.pdf.

1     173.    Google's market positions in the publisher Ad Server, Ad Exchange, and Ad

2   Network markets are protected by high barriers to entry.  For instance, publishers who might look

3   to switch products face high switching costs because these server products must be

4   programmatically and technologically built into the publishers' operations.  Moreover, any

5   potential rival seeking to gain market share at Google's expense must be able to deliver a pool of

6   advertisers that would participate in non-Google auctions and generate comparable revenue to

7   Google's auctions.  Given that Google already has in excess of 50% of each of these markets, and

8   uses the anticompetitive tactics alleged herein to protect those shares, the chances of any one rival

9   gaining sufficient share to be a true competitive threat are exceedingly low.

10     174.    Third, Google provides limited pricing information to publishers.  Thus, even if

11   there were competing publisher Ad Server, Ad Exchange, and Ad Network products for

12   publishers to switch to, those products would have significant difficulty in demonstrating to

13   publishers that switching is worthwhile because Google makes direct price comparisons nearly

14   impossible.

15     175.    These barriers inhibit entry and expansion by potential competitors in the publisher

16   Ad Server, Ad Exchange, and Ad Network markets, evidencing Google's monopoly power.

17     176.    The relevant geographic market is the United States, or in the alternative,

18   predominantly English-speaking countries of the United States, Canada, the United Kingdom,

19   and Australia.  Publishers seek out publisher Ad Server services based on the service provider's

20   ability to connect the publisher with advertisers that would seek to target the publisher's users.

21   Because publishers sell advertising space to advertisers based on, *inter alia*, the location of the

22   publishers' users, the geographic market's scope is determined by the publishers' targeted

23   consumer geographies, here, the United States, or in the alternative, predominantly English-

24   speaking countries of the United States, Canada, the United Kingdom, and Australia.  A publisher

25   Ad Server that could not connect publishers with a significant pool of advertisers seeking to target

26   American (or alternatively, English-speaking) consumers could not generate auction returns that

27   rivaled publisher Ad Servers that could deliver such advertiser demand.

28     177.    Google also has monopoly power in adjacent markets—such as the market for

advertiser-facing ad tech products.  Because many advertisers single-home, meaning they use only one set of advertising tools to access the open display advertising marketplace, Google's advertiser-facing ad tech products have become the sole access point to the market for a substantial portion of all advertisers.  Indeed, Google now controls 80 to 90% of the market for advertiser tools.

178.    Google also has monopoly power in search advertising, web browsers, and phone operating systems.  Google's power in these adjacent markets bears on Google's market power in the relevant markets and their barriers to entry.  These adjacent markets allow Google to lock customers into, and keep them dependent on, its ecosystem, but they are not the markets in which the challenged conduct occurred.  For instance, Google has used its search and mobile dominance to strong-arm publishers into a scheme called "AMP," whereby Google takes publisher content and hosts it on Google's own systems—thus ensuring that users never leave Google's websites even when viewing the non-Google content.  This allows Google to independently collect and retain information concerning the publishers' consumers, allowing Google to benefit from and control advertising associated with content created by others.

## V.    SUBSTANTIAL FORECLOSURE AND ANTICOMPETITIVE EFFECTS

179.    Google's conduct goes far beyond aggressive competition.    Google's anticompetitive actions intend to, and in fact do, exclude, substantially foreclose, and impair rivals and harm the competitive process.  The conduct is not competition on the merits or otherwise privileged.  Worse yet, the conduct has been systematically planned and thoroughly executed over many years; it is willful.

180.    Through the actions alleged above, Google has substantially foreclosed competition in each of the three alleged relevant markets.

181.    Google's conduct adversely affects competition and innovation in each of the relevant markets, including by, *inter alia*:

- Impairing the incentive of Google's competitors and potential competitors to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

- Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers;

- Reducing the incentive and ability of advertising platforms, and other competitors to innovate and differentiate their products in ways that will appeal to customers;

- Reducing competition and the spur to innovation by Google and others that only competition can provide;

- Impairing and excluding rivals from the three main relevant markets alleged herein by raising rivals' costs, blocking entry and expansion, and through other anticompetitive means;

- Enabling Google to charge supracompetitive prices and overcharge publishers, by artificially inflating the take rate extracted from publisher ad sales and otherwise artificially and anti-competitively reducing the revenue Google remits to them from ad sales to advertisers.

182.   Through the anticompetitive conduct described above, Google foreclosed what few service providers remained by steering auctions to Google's services and away from the other service providers, and taxing/raising such rivals' costs when the rivals managed to win auctions for Google's publisher-clients' ad inventory notwithstanding the hurdles Google imposed. Because of this conduct, potential rivals lack the ability to generate scale sufficient to compete with Google.

183.   The foreclosure caused by Google's conduct in the publisher Ad Server market can be seen by the exit of competitors and limited entry over the past decade or so.  Several large advertising technology firms offered publisher Ad Server solutions, including substantial competitive offerings from Yahoo!, AppNexus, and OpenX.  Today, few publisher Ad Server competitors remain in the United States.  Yahoo's publisher Ad Server was acquired in 2017 and shuttered in 2019.  AppNexus's publisher Ad Server was acquired by AT&T and rebranded to Xandr but faces an uncertain future as AT&T is reportedly considering selling the publisher Ad

1   Server.  OpenX shut down its Ad Server solution in 2019.

2        184.    Entry into the publisher Ad Server market has been remarkably weak over the past
3   decade.  This lack of entry is a result of high switching costs for publishers augmented by the
4   artificial barriers arising from Google's anticompetitive conduct.  As a result, publishers have
5   very limited alternatives to Google's publisher ad serving product, and rivals are unable to
6   compete by improving quality or lowering price.

7        185.    Google's conduct has also substantially impaired competition in the Ad Exchange
8   and Ad Network markets, which Google has monopolized or, in the alternative, achieved a
9   dangerous probability of monopolizing by virtue of its intentional and unlawful conduct.

10       186.    Google's taxes on rivals have contributed to the consolidation of the Ad Exchange
11  market fostering Google's maintenance and expansion of its power in that market.  When Google
12  entered that market in 2009, it was highly competitive, and had previously been populated by at
13  least eight vigorous competitors.

14       187.    Since then, in part as a direct result of Google's anticompetitive conduct, several
15  Ad Exchanges have left the Ad Exchange business, including adBrite, Yahoo, and the ASDAQ
16  exchange.  Among the remaining major competitors, Rubicon has consistently lost money and
17  been barely profitable.  Rubicon has attempted to remain alive in the Ad Exchange business by
18  sharply cutting its fees to percentages in the low teens or lower, a strategy which the company
19  itself admitted may not succeed.  The financial condition of OpenX, another competing privately
20  owned Ad Exchange, is not publicly reported and therefore unknown, although it was reported to
21  have laid off approximately 20 percent of its staff at the end of 2018, and added more layoffs
22  earlier this year.

23       188.    In the Ad Network market, Google's use of its Ad Server product to block the bids
24  of competing Ad Networks has driven more market share to Google's own Ad Network.  By
25  anticompetitively driving additional usage of its Ad Network, Google has unlawfully maintained
26  its monopoly or enhanced the probability of it gaining monopoly power in the Ad Network market
27  by impeding its rivals' ability to compete on the merits, including through the use of strategies
28  raising rivals' costs.

189.   In addition to economic harm in fact to customers and competitors, the exclusion of competitors from competition on the merits, and harm to consumers from thwarting competition on the merits, Google's conduct also increases costs in distribution of products and services in the relevant markets; abuses its gatekeeping function and increases cost of market access across markets; and causes reverse network effects that result when Google's products and services are prominent and properly functioning, while those of competitors are downgraded and unlawfully shut down by Google.

190.   Google's challenged conduct lacks any procompetitive justification.  Moreover, the harm to competition—particularly to publishers—in the Ad Exchange, Ad Network, and publisher Ad Server markets from Google's unlawful conduct more than offsets any pro-competitive benefits or justifications Google may offer.

191.   Google has made the remarkable assertions that it is immune from challenges to its misconduct because its policies and practices "account of conflicting demands of publishers, advertisers, and consumers, in the interests of creating a level playing field in which the most useful ads are seen by the most relevant audiences."  Google is a business that maximizes its own revenue and self-interest.  As for the rest, ***antitrust law***, not Google, sets the playing field and it is an economic truth fundamental to our market system that what it most "useful" is determined through competition, not a single giant company.  It is the height of arrogance for Google to claim that it should control the market, or that it can abuse its market power because it knows what is best.

## VI.   CLASS ALLEGATIONS

192.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes ("Classes"):

- Class 1 – All persons that received revenue directly from Google for displaying advertisements using Google's Ad Exchange services from December 15, 2016 through the present ("Class Period").

1    • Class 2 – All persons that received revenue directly from Google for displaying

2         advertisements using Google's Ad Network services during the Class Period.

3    Specifically excluded from the Classes are: Defendants; the officers, directors, or employees of

4    any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal

5    representative, heir, or assign of any Defendant, and any person acting on their behalf.   Also

6    excluded from the Classes are any judicial officer presiding over this action and the members of

7    his/her immediate family and judicial staff, and any juror assigned to this action.

8         193.    The Classes are readily ascertainable and the records for them should exist,

9    including, specifically, Defendants' own records and transaction data.

10        194.    Due to the nature of the trade and commerce involved, there are thousands of

11   geographically dispersed members in the Classes, the exact number and their identities being

12   known to Defendants.

13        195.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs

14   and members of the Classes sustained damages arising out of Defendants' common course of

15   conduct in violation of the laws alleged herein.  The damages and injuries of each member of the

16   Classes were directly caused by Defendants' wrongful conduct.

17        196.    There are questions of law and fact common to the members of the Classes,

18   including, but not limited to, the following:

19        • whether Google has monopoly power in the publisher Ad Server, Ad

20             Exchange, and/or Ad Networks markets;

21        • whether Google has imposed implicit and explicit taxes on rival Ad

22             Exchanges;

23        • whether the imposition of such taxes constitutes monopolization, monopoly

24             maintenance, and/or attempt to monopolize the Ad Exchange market;

25        • whether Google's tie of its publisher Ad Server and Ad Exchange products

26             furthers Google's monopolization, monopoly maintenance, and/or attempt to

27             monopolize the Ad Exchange market;

28

1
2
3
4
5
6
7
8
9
10
11

- whether Google has blocked rival Ad Networks from competing for publisher inventory;
- whether Google's conduct with respect to rival Ad Networks constitutes monopolization, monopoly maintenance, and an attempt to monopolize the Ad Network market;
- whether Google's conduct has harmed Plaintiffs and class members by reducing their revenues from the sale of their ad inventory;
- whether Google's conduct has harmed Plaintiffs and class members by causing them to pay supracompetitive prices for Google's Ad Exchange, Ad Network, and publisher Ad Server services; and
- the appropriate Class-wide measures of damages.

197.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Classes.

198.    Questions of law or fact that are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

199.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

27
28

1    **VII.    ANTITRUST INJURY**

2        200.    Plaintiffs and members of both proposed Classes have suffered antitrust injury as

3    a direct result of Google's unlawful conduct.   As a direct and proximate result of Google's

4    anticompetitive conduct, as alleged herein, Plaintiffs and members of the Classes suffered

5    substantial losses to their business or property by paying artificially inflated prices to Google for

6    its services in the relevant markets and causing their revenues from selling non-search digital

7    display advertising space to be artificially suppressed during the Class Period.  The full amount

8    of such damages will be calculated after discovery and upon proof at trial.

9        201.    Due to Google's ill-gotten market power, through the conduct alleged herein,

10   Plaintiffs and the Classes paid Google a supracompetitive cut of the advertising revenues

11   publishers generated for user visits to their sites.  Absent this anticompetitive conduct, however,

12   Plaintiffs and members of the Classes would have paid less to Google and received more revenues

13   for advertising on their sites.

14       202.    Total damages from Google's unlawful conduct suffered by Class members during

15   the Class Period amount, at the very least, to hundreds of millions of dollars.   Google's

16   anticompetitive conduct is continuing and so are the damages suffered by members of the Classes.

17       203.    Google's conduct alleged herein manipulates the auctioning and ad placement

18   processes in ways that favor Google and suppress the net advertising income publishers receive

19   from Google.

20       204.    Google represents the interests of two sides of the Ad Tech Stack that conflict;

21   advertisers want to pay as little as possible, whereas publishers want to maximize their revenues.

22   Google represents neither interest.  Google instead prioritizes Google's services to maximize the

23   revenue Google can retain from advertiser payments before transmitting the net payments to

24   publishers; in other words, Google seeks to maximize the spread between what advertisers pay

25   and what publishers receive in connection with each ad placement because Google retains that

26   difference.

27       205.    In a competitive market, publishers would seek out Ad Servers, Ad Exchanges,

28   and Ad Networks that would represent the publishers' interests, including maximizing publishers'

1    revenue from auctions as opposed to prioritizing the vendors' own services to maximize the

2    vendors' ability to capture commissions.  This competition would drive down the cost of services

3    in the Ad Tech Stack and increase publishers' ad revenues by more efficiently running auction

4    processes, as well as improving the quality of publisher-facing ad tech services.   Every

5    stakeholder in the market—except Google—would benefit.

6          206.    When Google's anticompetitive conduct is stopped, those supercompetitive take

7    rates will be lowered by increased competition to the benefit of publishers, advertisers, and—

8    ultimately—consumers.  Google currently retains at least 30% of what Google's advertisers pay

9    to place ads on Google's publishers' pages (and analyses of pre-2019 periods estimate that Google

10   took around 50% of advertiser payments), and in a competitive market, Google would retain a

11   lower share of what would likely be higher gross revenues.

12         207.    Publishers' revenues would be higher absent Google's conduct for a variety of

13   reasons including, without limitation, auction bids would be higher as participants combine into

14   unified auctions without Google's self-preferencing and manipulations.   Furthermore, absent

15   Google's anticompetitive conduct, Google's commissions would decrease, and publishers would

16   see higher net revenues.  With more revenues, publishers would expand output creating more ad

17   impressions for sale.

18         208.    In December 2019, the CMA reached a similar conclusion after a six-month

19   inquiry into online platforms and digital advertising.  Drawing on four different data sources, the

20   CMA estimated Google's average "take rate" by its main advertiser and publisher-facing

21   intermediaries.  It calculated an average Ad Server fee of 22% and a weighted advertiser tool fee

22   of 18%—making the overall "take rate" for matching advertisers to publishers 40% of the total

23   ad spend.  These findings ultimately led it to conclude that "the fact that intermediaries are able

24   to take more than a third of the total amount paid by advertisers raises legitimate concerns about

25   whether the intermediation chain is operating efficiently." It added that "competition [in the

26   digital advertising space] would drive greater innovation and put downward pressure on fees."

27

28

**VIII.   GOOGLE CANNOT JUSTIFY ITS ILLEGAL CONDUCT**

209.    Google cannot justify its restraints of trade and monopolizing conduct.

210.    Google cannot supportably claim efficiency justifications for its conduct because Google's conduct creates numerous inefficiencies.

211.    Nor is there any valid argument that monopoly power is somehow desirable in the relevant markets.  Even in markets with network effects, antitrust law does not recognize a defense to anticompetitive conduct based on size.  Moreover, as confirmed by relevant empirical and economic literature, competition between platforms results in better quality, better matches, and lower net prices.  Competition on the merits—in both the Ad Exchange and Ad Network markets—will produce better outcomes for consumers than monopoly power because competing Ad Exchanges and Ad Networks will be incentivized to lower their take rates, increasing revenue to publishers enabling them to generate additional, higher-quality content.

212.    Nor can Google claim any of the abstract justifications often used when firms "vertically integrate." Google's integration in fact reflects a strategy through which Google raises barriers to entry and prevents new competitors or ways of doing business from breaking into the online advertising marketplace.

**IX.   CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

213.    California's substantive laws apply to every member of the Classes, regardless of where in the United States the Class member resides.  Defendants' Terms of Service explicitly state that California law will govern all disputes arising out of or relating to the terms, service-specific additional terms, or any related services, regardless of conflict of laws rules.  By choosing California law for the resolution of disputes covered by its Terms of Service, Google concedes that it is appropriate for this Court to apply California law to the instant dispute.

214.    Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, with the claims asserted by the Plaintiffs and all Class members, thereby creating state interests that ensure that the choice

of California state law is not arbitrary or unfair.  Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.  The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts with the claims of Plaintiffs and the proposed Classes, and California has the greatest interest in applying its laws here.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of § 2 of the Sherman Act, 15 U.S.C. § 2

### (Monopolization and Monopoly Maintenance)

215.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

216.    The relevant markets defined above are valid antitrust markets.

217.    Google has willfully maintained and/or enhanced monopoly power in the publisher Ad Server, Ad Network, and Ad Exchange markets.

218.    Google possesses monopoly power in the publisher Ad Server, Ad Network, and Ad Exchange markets.  Google willfully seeks to maintain and enhance its monopoly power through anticompetitive conduct.

219.    There are no procompetitive benefits or justifications that offset the competitive harm of Google's unlawful conduct.

220.    As a result of Google's unlawful conduct as alleged herein, Plaintiffs and members of the Classes have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

1

**COUNT II**

2

**Violation of § 2 of the Sherman Act, 15 U.S.C. § 2**

3

**(Attempted Monopolization)**

4      221.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of

5 this Complaint.

6      222.    The relevant markets defined above are valid antitrust markets.

7      223.    Should Google be found to lack the power necessary for monopolization liability

8 in any of the relevant markets or for any relevant time period, Plaintiffs assert in the alternative

9 as to such markets and/or time periods as follows:

10     224.    Google has intentionally and unlawfully attempted to monopolize the Ad Network,

11 Ad Exchange, and/or publisher Ad Server markets through anticompetitive conduct, including,

12 *inter alia*, its implicit and explicit taxes on rival Ad Exchanges and its blocking of bids from rival

13 Ad Networks; its interference with and manipulation of auctions and header bidding; and by tying

14 and/or anticompetitive *Microsoft*-style bundling both its publisher Ad Server, on the one hand,

15 and its Ad Network and/or Ad Exchange, on the other.

16     225.    Google has acted with the specific intent to monopolize the Ad Network, Ad

17 Exchange markets, and/or publisher Ad Server markets.

18     226.    Google has a dangerous probability of monopolizing the Ad Server and/or Ad

19 Network and/or the Ad Exchange markets by excluding competitors, undermining quality,

20 squelching innovation, and raising the total price of services.

21     227.    There is no legitimate business justification for Google's conduct.

22     228.    As a result of Google's unlawful conduct, Plaintiffs have suffered, and continue

23 to suffer, monetary harm in an amount to be proved at trial.

24

**COUNT III**

25

**Violation of California's Unfair Competition Law**

26

**(Cal.  Bus.  & Prof.  Code § 17000 *et seq.*)**

27     229.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of

28 this Complaint.

1      230.    Google's conduct constitutes deceptive, fraudulent, unlawful and/or unfair

2  business acts and practices.

3      231.    Google's conduct threatens an incipient violation of the antitrust laws alleged

4  herein, and it violates the policy and spirit of those laws because the effects of the conduct are

5  comparable to or the same as a violation of the law, and it otherwise significantly threatens and

6  harms competition.

7      232.    Additionally, Google's conduct on balance harms consumers and competition,

8  offends established public policy, is substantially injurious to consumers, and is neither

9  outweighed by countervailing benefits nor avoidable by consumers.

10      233.    Plaintiffs and members of the Classes have been deprived of money or property as

11  a result of Google's unfair business practices alleged herein through numerous mechanisms,

12  including, but not limited to Google's artificially suppression of publishers' advertising revenue

13  through (a) artificially inflated fees, and (b) artificially reduced prices for ad space.

14                            **REQUEST FOR RELIEF**

15      234.    WHEREFORE, Plaintiffs and the Class members request the Court to enter

16  judgment in their favor against Defendants, awarding all such relief as the Court deems

17  appropriate and just.

18      235.    Plaintiffs request the following relief:

19           A.      That the Court determine that this action may be maintained as a class

20  action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and

21  direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil

22  Procedure, be given to Class members;

23           B.      That the Court enter an order declaring that Defendants' actions, as

24  alleged herein, violate the law;

25           C.      That the Court award Plaintiffs and Class members damages, treble

26  damages, punitive damages, and/or restitution in an amount to be determined at trial;

27           D.      That the Court order Defendants to fully divest their publisher Ad Server

28  line of business, and refrain from operating within the market for publisher Ad Server products;

1           E.       That the Court permanently enjoin Defendants, their affiliates, successors,

2    transferees, assignees, and other officers, directors, agents, and employees thereof from

3    continuing, maintaining, or renewing the conduct alleged herein, and from adopting or following

4    any practice, plan, program, or device having a similar purpose or effect;

5           F.       That the Court award Plaintiffs pre- and post-judgment interest;

6           G.       That the Court award Plaintiffs their costs of suit, including reasonable

7    attorneys' fees and expenses; and

8           H.       That the Court award any and all such other relief as the Court may deem

9    proper.

10   **JURY TRIAL DEMAND**

11       236.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

12   a jury trial of all issues so triable.

13

14   Dated: April 5, 2021             Respectfully submitted,

15                                BOIES SCHILLER FLEXNER LLP

16                                By: */s/ Philip C. Korologos*

17                                Philip C. Korologos*
                                  pkorologos@bsfllp.com

18                                Brianna S. Hills*
                                  bhills@bsfllp.com

19                                BOIES SCHILLER FLEXNER LLP

20                                55 Hudson Yards, 20th Floor
                                  New York, NY 10001

21                                Tel.: (212) 446-2300 / Fax: (212) 446-2350

22                                David Boies*

23                                dboies@bsfllp.com
                                  BOIES SCHILLER FLEXNER LLP

24                                333 Main Street
                                  Armonk, NY 10504

25                                Tel.: (914) 749-8200 / Fax: (914) 749-8300

26                                Abby L. Dennis*

27                                adennis@bsfllp.com
                                  Jesse Panuccio*

28                                jpanuccio@bsfllp.com
                                  BOIES SCHILLER FLEXNER LLP

1    1401 New York Avenue, NW
     Washington, DC 20005
2    Tel.: (202) 895-7580 / Fax: (202) 237-6131

3    Mark C. Mao (236165)
     mmao@bsfllp.com
4    Sean P. Rodriguez (262437)
     srodriguez@bsfllp.com
5    BOIES SCHILLER FLEXNER LLP
     44 Montgomery Street, 41st Floor
6    San Francisco, CA 94104
7    Tel.: (415) 293-6820 / Fax: (415) 293-6899

8    Sabria A. McElroy*
9    smcelroy@bsfllp.com
     BOIES SCHILLER FLEXNER LLP
10   401 E. Las Olas Blvd., Suite 1200
     Fort Lauderdale, FL 33301
11   Tel.: (954) 377 4216 / Fax: (954) 356-0022

12   George A. Zelcs*
13   gzelcs@koreintillery.com
     Robert E. Litan*
14   rlitan@koreintillery.com
     Randall P. Ewing*
15   rewing@koreintillery.com
     Jonathon D. Byrer*
16   jbyrer@koreintillery.com
     Ryan A. Cortazar*
17   rcortazar@koreintillery.com
18   KOREIN TILLERY LLC
     205 North Michigan Avenue, Suite 1950
19   Chicago, IL 60601
     Tel.: (312) 641-9750 / Fax: (312) 641-9751
20
21   Stephen M. Tillery*
     stillery@koreintillery.com
22   Michael E. Klenov (277028)
     mklenov@koreintillery.com
23   Carol L. O'Keefe*
     cokeefe@koreintillery.com
24   Jamie Boyer*
     jboyer@koreintillery.com
25   KOREIN TILLERY LLC
26   505 North 7th Street, Suite 3600
     St. Louis, MO 63101
27   Tel.: (314) 241-4844 / Fax: (314) 241-3525
28

1

*Counsel for Genius Media Group, Inc., The*
*Nation Company, L.P., and The Progressive, Inc.*

2

3  Dated: April 5, 2021                          BERGER MONTAGUE PC

4
                                                 By: */s/ Eric L. Cramer*
5                                                Eric L. Cramer*
                                                 ecramer@bm.net
6                                                Michael C. Dell'Angelo*
                                                 mdellangelo@bm.net
7                                                Caitlin G. Coslett*
                                                 ccoslett@bm.net
8                                                Patrick F. Madden*
                                                 pmadden@bm.net
9                                                Michaela Wallin*
                                                 mwallin@bm.net
10                                               BERGER MONTAGUE PC
11                                               1818 Market St., Suite 3600
                                                 Philadelphia, PA 19103
12                                               Tel.: (215) 875-3000 / Fax: (215) 875-4604

13
                                                 Sophia M. Rios (305801)
14                                               srios@bm.net
                                                 BERGER MONTAGUE PC
15                                               12544 High Bluff Drive, Suite 340
                                                 San Diego, CA 92130
16                                               Tel.: (619) 489-0300 / Fax: (215) 875-4604

17
                                                 Daniel J. Walker*
18                                               dwalker@bm.net
                                                 BERGER MONTAGUE PC
19                                               2001 Pennsylvania Ave., NW
                                                 Suite 300
20                                               Washington DC 20006
                                                 Tel.: (202) 559-9745
21

22                                               Michael K. Yarnoff**
                                                 myarnoff@kehoelawfirm.com
23                                               KEHOE LAW FIRM, P.C.
                                                 Two Penn Center Plaza
24                                               1500 JFK Blvd., Suite 1020
                                                 Philadelphia, PA 19102
25                                               Telephone: (215) 792-6676

26
                                                 *Counsel for Sterling International Consulting*
27                                               *Group*

28

**CONSOLIDATED CLASS ACTION**        62        Case No. 5:20-cv-08984-BLF
**COMPLAINT**

1

Dated: April 5, 2021

ROBBINS GELLER RUDMAN
& DOWD LLP

2

By: /s/ David W. Mitchell

3

DAVID W. MITCHELL
davidm@rgrdlaw.com
STEVEN M. JODLOWSKI

4

sjodlowski@rgrdlaw.com
655 West Broadway, Suite 1900

5

San Diego, CA 92101-8498

6

Tel.: (619) 231-1058 / Fax: (619) 231-7423

7

PAUL J. GELLER*

8

STUART A. DAVIDSON*
Robbins Geller Rudman & Dowd LLP

9

120 East Palmetto Park Road, Suite 500

10

Boca Raton, FL 33432
Tel.: (561) 750-3000 / Fax: (561) 750-3364

11

John C. Herman*

12

(GA Bar No. 348370)
jherman@hermanjones.com

13

Serina M. Vash**

14

(NJ Bar No. 041142009)
svash@hermanjones.com

15

HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650

16

Atlanta, Georgia 30326

17

Tel.: (404) 504-6500 / Fax: (404) 504-6501

18

*Counsel for Plaintiff Sweepstakes Today, LLC*

19

20

Dated: April 5, 2021

KIRBY McINERNEY LLP

21

By: /s/ Robert J. Gralewski, Jr.
Robert J. Gralewski, Jr. (196410)

22

bgralewski@kmllp.com
Samantha L. Greenberg (327224)

23

sgreenberg@kmllp.com
KIRBY McINERNEY LLP

24

600 B Street, Suite 2110

25

San Diego, CA 92101
Telephone: (619) 784-1442

26

Karen Lerner**

27

klerner@kmllp.com
Daniel Hume**

28

dhume@kmllp.com

CONSOLIDATED CLASS ACTION
COMPLAINT

63

Case No. 5:20-cv-08984-BLF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

David Bishop**
dbishop@kmllp.com
Andrew McNeela**
amcneela@kmllp.com
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

HINKLE SHANOR LLP
Thomas M. Hnasko**
Michael E. Jacobs**
218 Montezuma Avenue
Sante Fe, NM 87501
Telephone: (505) 982-4554
thnasko@hinklelawfirm.com
mjacobs@hinklelawfirm.com

WILLIAMS LAW FIRM
Kent Williams**
1632 Homestead Trail
Long Lake, MN 55356
Tel.: (612) 940-4452 / Fax: (952) 283-1525
williamslawmn@gmail.com

*Counsel for JLaSalle Enterprises LLC*

Dated: April 5, 2021

GUSTAFSON GLUEK PLLC

By: */s/ Dennis Stewart*
Dennis Stewart (99152)
dstewart@gustafsongluek.com
GUSTAFSON GLUEK PLLC
600 B Street
17th Floor
San Diego, CA 92101
Telephone: (619) 595-3299

Daniel E. Gustafson*
dgustafson@gustafsongluek.com
Daniel C. Hedlund*
dhedlund@gustafsongluek.com
Daniel J. Nordin*
dnordin@gustafsongluek.com
Ling S. Wang*
lwang@gustafsongluek.com
GUSTAFSON GLUEK PLLC

Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844

Marc H. Edelson, Esq*
medelson@edelson-law.com
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel.: (215) 867-2399 / Fax: (267) 685-0676

Joshua H. Grabar*
jgrabar@grabarlaw.com
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085 / Fax: (267) 507-6048

E. Powell Miller*
epm@millerlawpc.com
Sharon S. Almonrode*
ssa@millerlawpc.com
Emily E. Hughes*
eeh@millerlawpc.com
THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200 / Fax: (248) 652-2852

Simon Bahne Paris, Esquire*
sparis@smbb.com
Patrick Howard, Esquire*
phoward@smbb.com
SALTZ, MONGELUZZI & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel.: (215) 496-8282 / Fax: (215) 496-0999

Kenneth A. Wexler*
kaw@wexlerwallace.com
Kara A. Elgersma*
kae@wexlerwallace.com
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603

Dianne M. Nast*
dnast@nastlaw.com
Daniel N. Gallucci*
dgallucci@nastlaw.com
Joseph N. Roda*
jnroda@nastlaw.com
NASTLAWLLC
1101 Market Street, Suite 2801
Philadelphia, PA 19106

*Counsel for Mikula Web Solutions, Inc.*

*\*Pro Hac Vice*
*\*\*Pro Hac Vice* pending

1

## FILER'S ATTESTATION

2     Pursuant to Civil L.R. 5-1(i)(3), regarding signatures, I, Philip C. Korologos attest that

3 concurrence in the filing of:

4     **CONSOLIDATED CLASS ACTION COMPLAINT**

5     has been obtained from each of the other signatories.

6

7 Dated: April 5, 2021                    */s/ Philip C. Korologos*

Philip C. Korologos

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28