David Boies*
  dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

Philip C. Korologos*
  pkorologos@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

Mark C. Mao (236165)
  mmao@bsfllp.com
Sean P. Rodriguez (262437)
  srodriguez@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820 / Fax: (415) 293-6899

Abby L. Dennis*
  adennis@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

Carol L. O'Keefe*
  cokeefe@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Tel.: (314) 241-4844 / Fax: (314) 241-3525

George A. Zelcs*
  gzelcs@koreintillery.com
Robert E. Litan*
  rlitan@koreintillery.com
Marc A. Wallenstein*
  mwallenstein@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Tel.: (312) 641-9760 / Fax: (312) 641-9751

Eric L. Cramer*
  ecramer@bm.net
Michael C. Dell'Angelo*
  mdellangelo@bm.net
Caitlin G. Coslett*
  ccoslett@bm.net
Patrick F. Madden*
  pmadden@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000 / Fax: (215) 875-4604

* *Pro Hac Vice*

*Counsel for Publisher Plaintiffs*

[Additional Counsel identified on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re GOOGLE DIGITAL PUBLISHER ANTITRUST LITIGATION | No. 5:20-cv-08984-BLF |

**PUBLISHER PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

| | |
|---|---|
| Date: | October 14, 2021 |
| Time: | 9:00 a.m. |
| Courtroom: | 3, 5th Floor, San Jose |
| Judge: | Hon. Beth Labson Freeman |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................................ 1

3

LEGAL STANDARD ......................................................................................................... 4

4

ARGUMENT ...................................................................................................................... 4

5

I.       Publisher Plaintiffs Adequately Plead Relevant Product Markets ........................ 4

6

         A.      Applicable Legal Standards for Defining Relevant Markets .................... 5

7

8

         B.      Walled Gardens Are Not Substitutes For Tools to Sell Publishers' Own Ad Space  6

9

         C.      Direct Deals Are Not in the Relevant Markets .......................................... 8

10

         D.      The Complaint Does Not Allege That YouTube Is in Any Relevant Market ........... 9

11

12

         E.      *Amex* Does Not Create Any Special Pleading Burden—and Publishers Allege All
                 the Facts Needed for an *Amex*-Style Analysis ......................................... 9

13

14

         F.      Google Cannot Use Market Shares to Escape Antitrust Scrutiny ......................... 10

15

II.      Plaintiffs Sufficiently Allege Unlawful Exclusionary Conduct ......................... 12

16

         A.      Google Used Illegal Ties to Cement Its Gatekeeper Role....................... 13

17

         B.      Google Used Its Gatekeeping Position to Undermine Competition—Not to
                 Compete on the Merits .......................................................................... 15

18

19

         C.      Plaintiffs Do Not Allege Single-Market Refusals to Deal ...................... 18

20

III.     The Court Should Evaluate Google's Course of Conduct Collectively.............................. 22

21

IV.      The California Unfair Competition Law Claims are Well Pled.......................................... 24

22

CONCLUSION ................................................................................................................ 25

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, LP,*
   592 F.3d 991 (9th Cir. 2010)...................................................................................... 22

4

5

*Apple iPod iTunes Antitrust Litig.,*
   2009 WL 10678940 (N.D. Cal. Oct. 30, 2009)........................................................... 14

6

*Arista Networks, Inc. v. Cisco Sys. Inc.,*
   No. 16-CV-923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018).............................. *passim*

7

8

*Bayou Bottling, Inc. v. Dr. Pepper Co.,*
   725 F.2d 300 (5th Cir. 1984)....................................................................................... 19

9

10

*Brown Shoe Co. v. U.S.,*
   370 U.S. 294 (1962) .............................................................................................. 4, 5, 6, 8

11

*Caldera, Inc. v. Microsoft Corp.,*
   87 F. Supp. 2d 1244 (D. Utah 1999) ........................................................................ 19, 21

12

13

*California Computer Products, Inc. v. International Business Machines, Corp.,*
   613 F.2d 727 (9th Cir. 1979)....................................................................................... 22

14

15

*California v. Sutter Health System,*
   84 F. Supp. 2d 1057 (N.D. Cal. 2000) ........................................................................ 7

16

*Cascade Health Sols. v. PeaceHealth,*
   515 F.3d 883 (9th Cir. 2008)................................................................................... 13, 23

17

18

*Cel-Tech Comm., Inc. v. L.A. Cellular,*
   20 Cal. 4th 163 (1999)................................................................................................ 24

19

20

*Cent. Valley Med. Grp., Inc. v. Indep. Physician Assocs. Med. Grp., Inc.,*
   2019 WL 3337891 (E.D. Cal. July 25, 2019) ........................................................... 24

21

*Chavez v. Whirlpool Corp.,*
   93 Cal. App. 4th 363 (2001)........................................................................................ 24

22

23

*Chicago Bridge & Iron Co. N.V. v. F.T.C.,*
   534 F.3d 410 (5th Cir. 2008)....................................................................................... 9

24

*Christy Sports LLC v. Deer Valley Resort Co., Ltd.,*
   555 F.3d 1188 (10th Cir. 2009).................................................................................. 19

25

26

*Church & Dwight Co., Inc. v. Mayer Labs. Inc.,*
   2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ...................................................... 16, 18, 19

27

28

*City of Anaheim v. Southern Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) .................................................................................. 23

*City of Groton v. Connecticut Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981) ................................................................................. 23, 24

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) .................................................................................. 16

*Collegenet, Inc. v. The Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Ore. 2018) .................................................................. 14, 15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ............................................................................................... 22

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
290 F.3d 768 (6th Cir. 2002) ............................................................................. 16, 19

*Creative Mobile Techs., LLC v. Flywheel Software, Inc.*,
2016 WL 5815311 (N.D. Cal. Oct. 5, 2016) ........................................................ 24

*DocMagic, Inc. v. Ellie Mae, Inc.*,
745 F. Supp. 2d 1119 (N.D. Cal. 2010) ................................................................ 11

*Dreamstime.com, LLC v. Google, LLC*,
No. 18-cv-01910, 2019 WL 341579 (N.D. Cal. Jan. 28, 2019) ......................... 22, 24

*Eastman Kodak Co. v. Image Tech. Svcs., Inc.*,
504 U.S. 451 (1992) ............................................................................................ 5, 6

*F.T.C. v. Cardinal Health*,
12 F. Supp. 2d 34 (D.D.C. 1998) ............................................................................ 9

*F.T.C. v. Facebook, Inc.*,
No. CV 20-3590 (JEB), 2021 WL 2643627 (D.D.C. June 28, 2021) ................. 19, 21

*F.T.C. v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .............................................................................. 20, 21

*F.T.C. v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ............................................................................ 8

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) .................................................................. 24

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) ............................................................................... 23

*Free FreeHand Corp. v. Adobe Systems Inc.*,
852 F.Supp.2d 1171 (N.D. Cal. 2012) .............................................................. 13, 23

*Hines v. Youseff*,
 914 F.3d 1218 (9th Cir. 2019) ........................................................................... 4

*Image Tech. Servs. v. Eastman Kodak Co.*,
 125 F.3d 1195 (9th Cir. 1997) ...................................................................... 5, 14

*In re Lantus Direct Purchaser Antitrust Litig.*,
 950 F.3d 1 (1st Cir. 2020) ................................................................................ 16

*In re Webkinz Antitrust Litigation*,
 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010) ................................................ 15

*Innovative Health LLC v. Biosense Webster, Inc.*,
 2020 WL 8457483 (C.D. Cal. Dec. 11, 2020) ............................................... 15

*It's My Party, Inc. v. Live Nation, Inc.*,
 811 F. 3d 676 (4th Cir. 2016) .......................................................................... 14

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ............................................................................. 4

*Lacey v. Maricopa County*,
 693 F.3d 896 (9th Cir. 2012) ........................................................................... 23

*Le v. Zuffa, LLC*,
 216 F. Supp. 3d 1154 (D. Nev. 2016) ........................................................ 22, 23

*Live Universe, Inc. v. MySpace, Inc.*,
 304 F. Appx. 554 (9th Cir. 2008) .................................................................... 19

*Lorain Journal Co. v. United States*,
 342 U.S. 143 (1951) ........................................................................................ 18

*New York v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) ............................................................................ 21

*Newcal Industries v. Ikon Ofc. Sol.*,
 513 F.3d 1038 (9th Cir. 2008) ...................................................................... 5, 11

*Novell, Inc. v. Microsoft Corp.*,
 731 F.3d 1064 (10th Cir. 2013) ....................................................................... 18

*Ohio v. American Express Co.*,
 138 S. Ct. 2274 (2018) ........................................................................... 3, 9, 10

*Pac. Steel Grp. v. Commercial Metals Co.*,
 2021 U.S. Dist. LEXIS 97113 (N.D. Cal. May 21, 2021) .............................. 11

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
 555 U.S. 438 (2009) ........................................................................................ 20

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
  2018 WL 735978 (C.D. Cal. Feb. 6, 2018) .............................................................................. 13

*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*,
  351 F. Supp. 462 (E.D. Pa. 1972) ........................................................................................... 22

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*,
  814 F.2d 358 (7th Cir. 1987) ................................................................................................... 19

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ........................................................................................ 5, 10, 12

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
  2019 WL 7584729 (M.D. Fla. Dec. 4, 2019) .......................................................................... 15

*San Jose v. Comm'r of Baseball*,
  776 F.3d 686 (9th Cir. 2015) ................................................................................................... 24

*Simon and Simon, PC v. Align Technology, Inc.*,
  2021 WL 1309299 (N.D. Cal. April 8, 2021) ......................................................................... 23

*Spectrum Sports, Inc. v. McQuillan*,
  506 US 447 (1993) ................................................................................................................... 12

*Sumotext Corp. v. Zoove, Inc.*,
  2020 WL 533006 (N.D. Cal. 2020) ...................................................................................... 5, 7

*Swierkiewicz v. Sorema N. A.*,
  534 U.S. 506 (2002) ................................................................................................................... 4

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  2008 WL 4809441 (N.D. Cal. Oct. 28, 2008) ............................................................. 13, 22, 23

*Theme Promotions, Inc. v. News Am. Mktg.*,
  546 F.3d 991 (9th Cir. 2008) ..................................................................................................... 5

*Thompson v. 1-800 Contacts, Inc.*,
  2018 WL 2271024 (D. Utah 2018) ............................................................................................ 8

*Times-Picayune Pub. Co. v. United States*,
  345 U.S. 594 (1953) ................................................................................................................... 5

*Twin City Sportservice, Inc. v. Charles O. Finley & Co, Inc.*,
  512 F.2d 1264 (9th Cir. 1975) ............................................................................................. 5, 11

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ....................................................................................... 11, 13, 21

*United Shoe Machinery Corp. v. United States*,
  258 U.S. 451 (1922) ................................................................................................................. 19

MEMORANDUM IN OPPOSITION                      v                    Case No.: 5:20-cv-08984-BLF
TO MOTION TO DISMISS

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ............................................................................................. 9

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*,
    540 U.S. 398 (2004) ................................................................................................... 20

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429, 435 (7th Cir. 2020), *cert. denied*,
    2021 WL 2637989 (U.S. June 28, 2021) ................................................................. 13

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 4

Fed. R. Civ. P. 12(d) ................................................................................................... 4

**Acts**

Sherman Act ................................................................................................................ 1

**Other Authorities**

Horizontal Merger Guidelines (2017) ...................................................................... 5, 7

**INTRODUCTION**

Plaintiffs are internet publishers ("Publishers") that sell ad space on their websites using tools that they purchase from Google. Plaintiffs allege that Google engaged in a series of mutually reinforcing anticompetitive acts in adjoining markets to acquire and maintain monopoly power over the markets for these tools, artificially inflating Google's charges to Publishers and suppressing the prices Publishers receive for their ad space. Plaintiffs allege that Google's conduct constitutes actual and/or attempted illicit monopoly acquisition and maintenance under Section 2 of the Sherman Act and violates California's Unfair Competition Law.

In its motion to dismiss ("Motion" or "Mot."), Google portrays itself as a beneficent facilitator of the web advertising technology marketplace, claiming that it graciously undertakes "to ensure that advertisers do not pay too much while publishers do not receive too little." Mot. 2. But that is the problem. Google exploits its position as both the dominant overseer *and* the dominant participant in web ad auctions and related processes for its own gain at the expense of competition and other participants. Google operates auctions that Publishers use to sell their ad space and advertisers use to place ads on the open web, and also places bids on behalf of advertisers. In these auctions, Google sets the rules by which all participants, including itself, compete. Unsurprisingly, Google rigs the game in its favor. Google has cemented its omniscient gatekeeping role—overseeing all competition for the tools Publishers use to sell ads on their websites—through a series of exclusionary acts, anchored by illegal ties.

Plaintiffs' Consolidated Class Action Complaint ("Complaint" or "CC") alleges three relevant markets: Ad Server, Ad Exchange, and Ad Network. Ad Servers are the means by which Publishers display ads on their websites, sourcing ad placements in real-time from advertisers ("Advertisers") who purchase Publishers' web ad space through ad auctions. Ad Exchanges (for large Publishers) and Ad Networks (for smaller Publishers) (collectively, "Ad Intermediaries") match Publishers with Advertisers seeking to purchase ad space based on web page content, the specific viewer, and information about that viewer's interests. Publishers' sale of web ad space in this fashion is called "programmatic ad sales." Plaintiffs allege that Google has "over 80%" of the Ad Server market and in excess of 50-60% of the Ad Intermediary markets. CC ¶¶133, 73.

The Complaint alleges a series of mutually reinforcing anticompetitive ties, designed to drive market share to Google's Ad Intermediaries while also reinforcing its Ad Server monopoly. Google initially used its monopoly power to require its market-dominant pool of Advertisers to use only Google's Ad Intermediaries. Google then conditioned Publishers' access to its must-have pool of Advertiser demand through its Ad Intermediaries (tying products) on using Google's Ad Server (the tied product). Google then ran the tie the other way: (1) requiring smaller Publishers using its dominant Ad Server product (tying product) to use Google's Ad Network (tied product) exclusively, and (2) integrating its more complex Ad Server for larger Publishers (tying product) and its Ad Exchange (tied product) into a single marketed product, Ad Manager, effectively forcing Publishers using its Ad Server to allow Google's Ad Exchange to bid on ad space in auctions Google's Ad Server rigs in its favor.

Google's control over Publisher Ad Servers—bolstered through these ties—has given Google the power to exploit this illicitly-cemented gatekeeping position to rig the rules in its favor for the sale of the vast majority of all ad space on the open web. Google has done so by giving itself a last look, imposing a tax on customers that deal with Google's Ad Intermediary rivals, and blocking alternatives to Google's auctions, preventing Publishers from leveling the playing field.

Google seeks dismissal claiming that Plaintiffs have pleaded the Ad Intermediary markets too narrowly (Mot. 3-5); that its share of the Ad Intermediary markets is insufficient to show monopoly power (Mot. 8); that Google did not engage in exclusionary conduct, but merely refused to help rivals compete (Mot. 9-16); and that Plaintiffs have not sufficiently pled a violation of California's Unfair Competition Law (Mot. 17). These arguments have no merit.

As to market definition, Google contends that social networking and shopping sites must be included in the Ad Intermediary markets because these "walled gardens" purportedly constrain Google's pricing. Mot. 2, 4. But antitrust relevant markets are defined by the full set of products that are considered functionally and reasonably interchangeable *by their consumers*. Here, Publishers are the relevant consumers. Publishers use Google's Ad Intermediary tools to sell ad space on *their* websites. While Facebook and Amazon also sell ad space on their own sites, they do not provide services that enable Publishers to sell ad space on Publishers' websites. Similarly,

certain large Publishers sell a portion of their ad space directly to Advertisers on terms negotiated by employees ("Direct Deals"). The Complaint explains, however, that the high costs and low availability of Direct Deals means they cannot meaningfully constrain an Ad Exchange or Ad Network monopolist, and that even those Publishers who engage in Direct Deals need to use Ad Intermediaries for most of their ad sales. Thus, Direct Deals are likewise not reasonable substitutes for Google's Publisher tools to sell programmatic ads. *See* Part I.C, below.

Publishers amply allege bases for Google's market power in the relevant markets, including: high barriers to entry, CC ¶¶173-75, fragmented rivals with low market shares, CC ¶¶71, 72, and that Google's market shares "exceed 50-60%" in these intermediary tool markets, CC ¶73, which is higher than the 50% this Court has previously held to be sufficient in *Arista Networks, Inc. v. Cisco Sys. Inc.,* No. 16-CV-923-BLF, 2018 WL 11230167, at *18 (N.D. Cal. May 21, 2018) ("*Arista*"). Recognizing the intensely factual nature of the inquiry, the Complaint does not expressly characterize Ad Intermediaries as two-sided transactional platforms under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"). However, *Amex* imposes no such pleading requirement, and in any event, the Complaint alleges that Google artificially inflates rates both to Publishers *and* Advertisers, thereby pleading injury to both, which is all that is required even if the markets here are later determined to be two-sided. *See* Part I.E, below.

Google's argument that Plaintiffs have failed to plead exclusionary conduct improperly reframes Plaintiffs' allegations as a simple refusal to deal in which Google merely employed power stemming from its technological ingenuity to favor its own products on its own platform. Mot. 2. But Plaintiffs instead allege that Google engaged in a series of interconnected acts— anchored by illegal two-way ties—that put Google in position to control rivals. Google then leveraged that gatekeeping power to eliminate competition, undermine rivals, and punish customers, all while degrading the value of its products to customers. Longstanding antitrust precedent, including *Arista* in this Court, bars abuse of power acquired or cemented through coercion or deceit to undermine rivals. Google's cited authorities involve inapposite allegations about firms that had both lawfully acquired and legally maintained their monopoly status, and merely chose not to help rivals. Here, Google did not merely refuse to help rivals—it actively used

its illicitly-entrenched gatekeeping power to interfere with the competitive process, to harm rivals' customers, and to stack the deck in its favor—conduct which courts have repeatedly found to be unlawfully exclusionary. *See* Part II.B, below.

**LEGAL STANDARD**

Under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002), and "must draw all reasonable inferences" from those allegations in the plaintiff's favor, *Hines v. Youseff*, 914 F.3d 1218, 1227 (9th Cir. 2019). The Court "may not consider material outside the pleadings" unless those matters have been incorporated into the complaint by reference or are properly subject to judicial notice. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018); *see* Fed. R. Civ. P. 12(d).

**ARGUMENT**

**I.      Publisher Plaintiffs Adequately Plead Relevant Product Markets**

As summarized above, this case involves Ad Servers, Ad Exchanges, and Ad Networks. *E.g.*, CC ¶¶5-10, 158. The latter two—the Ad Intermediaries that match Advertisers with Publishers through programmatic ad auctions—serve distinct groups of Publishers and comprise distinct relevant markets. *Id.*; *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). Google argues that these Ad Intermediary markets are ill-defined because they do not include tools for selling ad space sold on social media or shopping sites, such as Facebook.com and Amazon.com—websites operating vertically-integrated platforms that sell their own ad space on their own platforms. Mot. 3. But the relevant markets here are defined based on the tools Publishers purchase to sell Publishers' ad space. The walled gardens are not part of the relevant markets here because the walled gardens do not sell tools that *Publishers* could purchase to sell the *Publishers'* ad space. CC ¶169. And Publishers do not and cannot sell advertising inventory space on "walled garden" websites, because Publishers do not own any advertising inventory space on sites like Facebook—Facebook owns it. *See id.* Google's contention that the Publishers could sell their ad space directly to Advertisers, seeking to include these "Direct Sales" in the relevant market, Mot. 5, is similarly erroneous. Such sales entail substantially higher costs, and even Publishers whose staffs negotiate

1    direct-sold ads still need Ad Intermediaries to sell the inevitable portion of ad space that direct-

2    sold ads cannot fulfill. CC ¶53.

3        **A.    Applicable Legal Standards for Defining Relevant Markets**

4        Plaintiffs pled their antitrust product markets based on the applicable standards, defining

5    boundaries by "the reasonable interchangeability of use or the cross-elasticity of demand between

6    the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Reasonable

7    interchangeability requires a "factual inquiry into the 'commercial realities' faced by consumers."

8    *Eastman Kodak Co. v. Image Tech. Svcs., Inc.*, 504 U.S. 451, 482 (1992) ("*Kodak I*"). Cross-

9    elasticity of demand refers to "whether consumers view the products as substitutes for each other."

10   *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-37 (9th Cir. 1995); *Sumotext Corp. v.

11   Zoove, Inc.*, 2020 WL 533006, *11 (N.D. Cal. 2020). Courts evaluate cross-elasticity by the

12   "hypothetical monopolist" test, which asks whether a complete monopolist—"the only present and

13   future seller" of products in the alleged market—could profitably impose a "small but significant

14   and non-transitory increase in price" ("SSNIP"). DOJ & F.T.C., Horizontal Merger Guidelines §

15   1.11 (2017); *Sumotext*, 2020 WL 533006 at *11 (citing *Theme Promotions, Inc. v. News Am.

16   Mktg.*, 546 F.3d 991, 1002 (9th Cir. 2008)).

17       Neither the reasonable interchangeability nor the cross-elasticity inquiry offers a bright-

18   line rule for pleading purposes. "For every product, substitutes exist. But a relevant market cannot

19   meaningfully encompass that infinite range." *Twin City Sportservice, Inc. v. Charles O. Finley &

20   Co, Inc.*, 512 F.2d 1264, 1271 (9th Cir. 1975). Instead, a "circle must be drawn narrowly to

21   exclude any other product to which, within reasonable variations in price, only a limited number

22   of buyers will turn." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613, 73 S. Ct. 872,

23   883, 97 L. Ed. 1277 (1953). Accordingly, market definition in sophisticated industries routinely

24   demands economic testimony and fact presentations to elucidate how the industry works, and is

25   not susceptible to resolution on a motion to dismiss. *See, e.g.*, *Newcal Industries v. Ikon Ofc. Sol.*,

26   513 F.3d 1038, 1045 (9th Cir. 2008); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195,

27   1203 (9th Cir. 1997).

28

---

MEMORANDUM IN OPPOSITION              5              Case No.: 5:20-cv-08984-BLF
TO MOTION TO DISMISS

1

### B. Walled Gardens Are Not Substitutes For Tools to Sell Publishers' Own Ad Space

2

3    Market definition must take the perspective of customers. *Kodak I*, 504 U.S. at 482. This

4    case focuses on antitrust injuries incurred *by Publishers* when they use Google's Ad Server and

5    Ad Intermediaries to sell ad space located on their own sites. The Publishers' perspective must

6    therefore control—and the Complaint pleads from that perspective. The Complaint alleges facts

7    fitting many of *Brown Shoe*'s classic "practical indicia," 370 U.S. at 325, including: the markets

8    include distinct tools that have "peculiar characteristics and uses," *id.*, namely, that Publishers use

9    these tools to participate in the auction process necessary to sell their programmatic ad space, CC

10   ¶169; the markets exclude "distinct customers," 370 U.S. at 325—namely, the massive, vertically-

11   integrated social media and shopping sites, such as Facebook and Amazon, that use their own

12   tools that are not available to Publishers, CC ¶¶163-69, *cf*. Mot 3 ("advertisements placed on

13   Facebook and Amazon reach only visitors *to those websites*") (emphasis added); and, there is

14   "industry or public recognition," 370 U.S. at 325, of this distinction between "walled gardens" and

15   "open display advertising," based in part on the industry's use of these terms to distinguish the

16   two, CC ¶169.

17   Google attempts to cloud the simple reality that Facebook and Amazon do not sell tools

18   that Publishers can use to sell their ad space by postulating a "downstream competition" theory,

19   asserting that Advertisers' ability to choose alternatives to Publishers' ad space constrains

20   Google's power over Ad Intermediaries. Mot. 4. In Google's telling, Advertisers are relevant

21   market participants that react to price changes that Google imposes on Publishers. Specifically,

22   Google asserts that if it were to raise prices to Publishers above competitive levels, Publishers

23   would pass those price increases on to Advertisers in the form of higher ad prices, which would in

24   turn cause Advertisers to flee from open display advertising. *Id.* 4.

25   Aside from being intensely fact-based, this "downstream competition" theory is

26   fundamentally flawed because it looks at the wrong product, the wrong customers, and the wrong

27   price increase. This is the *Publisher* case, not the *Advertiser* case, and Google needs to address

28   *Publishers'* options, not those of Advertisers. *Kodak I,* 504 U.S. at 482. Any hypothetical price

---

increase must occur in the relevant markets—the price for the services of Ad Intermediaries—where the alleged unlawful conduct takes place. *Sumotext*, 2020 WL 533006, at *11 (SSNIP tests are performed on "a product in the proposed market"). A proper downstream competition analysis—if even tenable at this stage—would need to address what Publishers, not Advertisers, would do in the face of an increase in the price of services sold by Ad Intermediaries. Faced with a SSNIP for Ad Exchange or Ad Network services, no Publisher can respond by utilizing Facebook or Amazon because neither provides services to sell the Publishers' ad space.

Further, Google's downstream theory contradicts the factual allegations of the Complaint, which at this stage must be accepted as true. Google's theory posits that a Google price increase *to Publishers* would increase ad prices *to Advertisers*, thereby causing Advertisers to switch to walled gardens. However, Plaintiffs expressly allege that Google has charged artificially inflated prices to Publishers and Publishers *have not passed those increases on to Advertisers*. *See* CC ¶¶201-205 (alleging that Google's conduct has reduced the amount Publishers receive for selling ad space). Even if Google's downstream theory were legally appropriate, it is at best premature.

Google's reliance on *California v. Sutter Health System*, 84 F. Supp. 2d 1057, 1067 (N.D. Cal. 2000), Mot. 4, is also misplaced. *Sutter* is a preliminary injunction order, issued after evidence and fact findings arising out of California's challenge of a proposed hospital merger. The State argued that Kaiser hospitals should not be considered "hospitals" for product market definition, because Kaiser provides services only to its own "captive" insurance customers. *Id.* at 1062, 1067-68. But a hospital is a hospital, whether its patients pay as part of an insurance contract or on a per-visit basis. *See id.* at 1067-68. Unlike hospital patients who can receive treatment at any hospital, Publishers have *no capacity* to sell their Publisher ad space through social media or shopping sites. Moreover, Google's quote from the Horizontal Merger Guidelines (Mot. 4) omits relevant context as the "influence of downstream competition" is the *last* in a long list of factors that "the Agencies take into account" when evaluating mergers. *Id.*; Guidelines, §4.1.3. The Guidelines also warn that the Agencies do *not* "evaluate the competitive effects of competing buyers strictly, or even primarily, on the basis of effects in the downstream markets." Merger Guidelines, §12. Even if "downstream competition" presented a market definition issue, it

would be a complex fact issue, not one for resolution on a motion to dismiss.

### C.  Direct Deals Are Not in the Relevant Markets

The Complaint explains that "Some large publishers with significant staffing and strong demand for their inventory are able to sell a limited number of advertisements directly to advertisers." CC ¶53. These Direct Deals are high cost, requiring "publishers to invest substantially in managing, selling, and serving online ad campaigns." *Id.* ¶165; *cf. Brown Shoe*, 370 U.S. at 325 (unique product facilities indicate separate products). These features mean that Direct Deals are only viable for a few high-value sales. *Id.*; *cf. Brown Shoe*, 370 U.S. at 325 ("distinct prices" indicate separate products). In all, Direct Deals can offer only unpredictable volume that is far from sufficient to run a website. *See id.* ¶¶53, 165; *cf. Brown Shoe*, 370 U.S. at 325 (unique characteristics indicate separate products). Even Publishers who engage in Direct Deals utilize programmatic channels to distribute remnant inventory. *Id.* As a result, Direct Deals will not prevent a hypothetical monopolist from imposing a SSNIP, are not reasonably interchangeable with the programmatic sales at issue, and therefore are not part of the relevant markets. *See id.* ¶¶164-65.

The mere fact that direct and programmatic sales tools are both means of selling the same product (ad space) does not mean that the two sales channels belong in the same relevant market. There is ample precedent for this basic proposition. *See, e.g.*, *F.T.C. v. Staples, Inc.,* 970 F. Supp. 1066, 1080 (D.D.C. 1997) (SSNIP establishes that sale of office supplies through superstores is an appropriate relevant product market for purpose of evaluating proposed Staples and Office Depot merger even though same products were also sold through other channels); *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *9 (D. Utah 2018) (relevant product market is online retail market for contact lenses even though same products also sold through other channels).

Google argues that among the Publishers are buyers so large and powerful that they will constrain Ad Network and Ad Exchange prices—as a matter of law. Mot. 5. Google is again wrong on the facts. The Complaint alleges that even large Publishers must use Ad Intermediaries for some of their inventory and cannot substitute to Direct Deals entirely. *See, e.g.*, CC ¶¶165-166. Google is also wrong on the law: "buyer power . . . alone cannot rebut" an antitrust claim. *F.T.C.*

1    *v. Cardinal Health*, 12 F. Supp. 2d 34, 61 (D.D.C. 1998). Power-buyer defenses are especially

2    weak where, as here, a market lacks transparent pricing. *Compare Chicago Bridge & Iron Co.*

3    *N.V. v. F.T.C.*, 534 F.3d 410, 439-440 (5th Cir. 2008) (rejecting a power-buyer defense where

4    relevant market used confidential bids, leaving the buyers with "imperfect information" with

5    which to negotiate lower prices), *with* CC ¶56 (opaque pricing), CC ¶¶145-56 (Google benefits

6    from information asymmetries) *and* CC ¶¶153-57 (Google actively works to degrade bid

7    information to Publishers and Advertisers).

8         **D.**     **The Complaint Does Not Allege That YouTube Is in Any Relevant Market**

9         Google reads into the Complaint allegations about YouTube. Mot. 3. The Motion cites

10   paragraphs that have nothing to do with YouTube or video advertising. Mot. 4 ("*See, e.g., id.*

11   ¶¶72, 165"). And Google's citation-free assertion that YouTube now sells its product under the

12   "Google Display Network" does not make YouTube part of any relevant market. Mot. 3-4.

13        **E.**     ***Amex* Does Not Create Any Special Pleading Burden—and Publishers Allege**

14                    **All the Facts Needed for an *Amex*-Style Analysis**

15        Google argues that *Amex* creates a special pleading rule about market definition; namely,

16   that two-sidedness must be both expressly pled and also decided on the pleadings. Mot. 6-7 (citing

17   a post-trial opinion, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019)). That

18   is not the law. *Amex* does not invent a new pleading requirement. To the contrary, *Amex* reasons

19   that antitrust market definition abhors "formalistic distinctions," and the *Amex* review of the trial

20   record undermines the notion that *Amex* encourages—let alone demands—new pleading burdens.

21   138 S. Ct. at 2285, 2287-90.

22        The Court need not wade into the thicket of deciding whether the Ad Intermediary markets

23   are two-sided in the *Amex* sense now because, contrary to Google's assertion that the Complaint

24   has "*nothing at all*" to say about "the implications" of a two-sided market, Mot. 6, the Complaint

25   addresses the key *Amex* considerations for a market that may be deemed two-sided. In particular,

26   *Amex* requires courts to consider the competitive effects (price and non-price alike) on both sides

27   of a two-sided market. 138 S Ct. at 2287-90. Out of an abundance of caution, the Complaint

28   alleges just that. For instance, Plaintiffs allege that Google's conduct enables it to take more

---

money from *both* Publishers and Advertisers. CC ¶55; *see also id.* ¶211 (Google's conduct has raised the "net prices" of its services by exploiting network effects). Publishers allege that Google's conduct has also caused non-price harms to both groups by degrading service quality, manipulating auctions, and coercing Advertisers to use Google's services over those of rivals. CC ¶¶95-96, 102.

In any event, Google mischaracterizes *Amex*. The *Amex* plaintiffs insisted on trying their case solely on the "merchant side" of the credit card market, presenting insignificant evidence of the challenged provisions' effects on cardholders. 138 S. Ct. at 2304. The plaintiffs' failure to consider the effect on cardholders—the other side of the two-sided market there—required a verdict in Amex's favor. *Id.* at 2287-90. The Court's legal holding is expressly limited, however. The threshold issue of two-sidedness requires complex fact finding about how the markets behave, including their price structures, that is inappropriate on a motion to dismiss. *Id.* at 2286. Should the Court choose to address *Amex* issues now, Plaintiffs have shown harm on "both sides." But the market in this case is too complex to be resolved on the pleadings, so any ultimate *Amex* determination should be deferred.

## F.      Google Cannot Use Market Shares to Escape Antitrust Scrutiny

Power in antitrust markets should not degenerate into "a numbers game" of market shares. *Rebel Oil*, 51 F.3d at 1438 n.10. The "wiser" approach is a careful analysis of both shares and other market facts. *Id.* Ad Intermediaries need to be able to offer a deep pool of ads ready to serve to internet users in an instant. *E.g.*, CC ¶¶15-16, 130-3. Only Google and a handful of other vendors could possibly supply such ad volume due to Google's market-dominant pool of Advertisers. *See, e.g.*, CC ¶¶183-84. And because a bigger collection of Advertisers attracts a bigger collection of Publishers, Google's Ad Intermediaries exhibit network effects—a feedback loop that strengthens Google's power over Publishers as it adds Advertisers, and *vice-versa*. CC ¶¶74-76, 82, 102, 123. That feedback loop, combined with other high barriers to entry and Google's misuse of its Ad Server monopoly, entrenches Google's Ad Intermediaries, and enhances Google's control in all the relevant markets. CC ¶¶74-76, 126, 132-35, 157, 173, 178. Firms as large as AT&T and Yahoo! tried to offer substitutes for the Ad Intermediaries that

1    Google dominates, but either withdrew or had very limited success. CC ¶¶74-79, 183-84, 211.

2        Yet Google argues that its market share in excess of 50-60% of the Ad Intermediary

3    markets (CC ¶73) means Google cannot exercise monopoly or attempted monopoly power as a

4    matter of law. Mot 8. This Court recently rejected that argument: "Although the Ninth Circuit

5    recognized that some 'courts have considered a 50% share of the market as inadequate to establish

6    a proscribed monopoly,' it did not preclude such a finding." *Arista*, 2018 WL 11230167, at *18

7    (quoting *Twin City*, 512 F.2d at 1274). *Arista* was a summary judgment opinion following

8    extensive discovery, where the Court had the benefit of a full factual record. In light of that record,

9    the Court held that "at least 50% market share" raised a triable question of market power. *Id.*; *see*

10   *also Pac. Steel Grp. v. Commercial Metals Co.*, 2021 U.S. Dist. LEXIS 97113, at *18 (N.D. Cal.

11   May 21, 2021) (collecting circuit court decisions). While Google now declares that in excess of

12   50%-60% is "clearly" insufficient, Mot. 8, Google's lead counsel here represented the *Arista*

13   plaintiff, *see* 2018 WL 11230167, at *1, and argued successfully the exact opposite: that

14   "monopoly power can be found even with 50% or greater market share." Arista Opposition to

15   Cisco's Motion for Summary Judgment, ECF No. 240, 16 Civ. 00923-BLF at 15, 2018 WL

16   2369182; *see also* Arista Motion for Partial Summary Judgment, ECF No. 213, No. 16 Civ.

17   00923-BLF at 5, 9-10, 2018 WL 1747452. That argument has even more force at the motion to

18   dismiss stage where market share factual issues are rarely resolved. *Newcal*, 513 F.3d at 1052.

19       Market share analysis at the pleading stage must also consider shares in conjunction with

20   other allegations that plausibly create market power. The network effects that market participants

21   obtain in technology markets can create power beyond what a bare market share suggests. Judge

22   Patel so held in an opinion where she cited the network effects in the *Microsoft* case as a factor

23   that created more market power than a casual share analysis would suggest. *DocMagic, Inc. v.*

24   *Ellie Mae, Inc.*, 745 F. Supp. 2d 1119 (N.D. Cal. 2010) (quoting and citing *U.S. v. Microsoft*

25   *Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001)). The Complaint makes the same network effects points

26   (*id.* at ¶¶74-82, 102 & 123) and cites *Microsoft* on that score. CC ¶135; *see also id.* ¶¶127, 224

27   (articulating how Google and its conduct exploits marketplace dynamics similar to those in

28   *Microsoft*). Finally, as to the attempted monopoly claim, it requires only a "dangerous probability"

1   that the defendant's misconduct will succeed in obtaining, maintaining, or expanding monopoly

2   power. *Spectrum Sports, Inc. v. McQuillan*, 506 US 447, 453-54 (1993). In "most" attempt cases,

3   courts use 30% share as the threshold. *Rebel Oil*, 51 F.3d at 1438.

4   **II.       Plaintiffs Sufficiently Allege Unlawful Exclusionary Conduct**

5          Through a series of anticompetitive bilateral ties between its Ad Server and Ad

6   Intermediary products, Google solidified itself as gatekeeper in all three relevant markets—

7   effectively acting as the overseer and tollbooth operator for all competition in these markets.

8   Google then abused its monopoly power and gatekeeping position by imposing rules and engaging

9   in predatory practices that further impaired and excluded competition. In short, Google: (1)

10  illegally tied its dominant Ad Servers, on one hand, and Ad Exchange and Ad Network products,

11  on the other, and *vice versa,* CC ¶¶11, 15-16, 64, 124-34; (2) punished Publisher-customers and

12  coerced exclusivity by requiring Publishers, as a condition of using Google's dominant Ad

13  Servers, to give Google exclusive control over the Publishers' own user data, CC ¶¶153-55; and,

14  (3) used its power bolstered through the illegal ties and other exclusionary conduct to undermine

15  alternatives to its auctions, and then, once its auctions became the only game in town, imposed

16  rules and fee structures to rig them against rivals. CC ¶¶89-122.

17         Google's course of exclusionary conduct revolves around anticompetitive bilateral ties

18  between its Ad Server and Ad Intermediary products. Google first exercised its dominance in tools

19  Advertisers use to purchase Publishers' ad space to drive volume and increase its power in the Ad

20  Intermediary Markets. *See, e.g.*, CC ¶¶11, 124-134. It then forced Publishers seeking access to

21  Google's Advertisers in the Ad Intermediary markets to use Google's Ad Servers. *See* CC ¶¶11,

22  64. Google also reversed the ties, requiring Publishers selecting Google's Ad Servers to use

23  Google's Ad Intermediaries. CC ¶¶15, 62, 131-34. Google's ties are self-reinforcing due to

24  "network effects": As Google's Ad Server controls the advertising decision-making of more

25  Publishers, it becomes more important for Advertisers to use Google's services lest they lose the

26  auctions Google uses its Ad Servers to rig in favor of Advertisers who use Google's ad buying

27  tools. CC ¶¶10, 64, 75-76. By gathering up those Advertisers, Google made itself even more

28  indispensable to Publishers, becoming like a snowball rolling down hill, gathering strength as it

1   went. *E.g.*, CC ¶¶74-76, 82, 102, 139. As a result, Google unlawfully cemented monopoly power

2   in all three relevant product markets. *Id.*; *see also id.* ¶189.

3        Importantly, the tying secured and entrenched Google's place as *the gatekeeper* for open

4   display advertising. Google has used its position to punish rival Ad Intermediaries and their

5   Advertiser customers. More specifically, Google rigged auctions so that Google's Advertisers

6   would "win"—even where Advertisers bidding through rival Intermediaries offered higher bids.

7   As a result, Google excluded and impaired Ad Intermediary rivals even where those rivals offered

8   Publishers and Advertisers lower prices, better service, or both. The Ninth Circuit condemns the

9   use of monopoly power that "impair[s] the opportunities of rivals" in a way that does not "further

10  competition on the merits." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir.

11  2008); *see also Free FreeHand Corp. v. Adobe Systems Inc.,* 852 F.Supp.2d 1171, 1180 (N.D. Cal.

12  2012) (same). Each of Google's acts is unlawfully exclusionary, but Google's course of conduct

13  also produces synergistic unlawful exclusionary effects and is appropriately evaluated collectively.

14  *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4809441 (N.D. Cal. Oct. 28, 2008).

15       **A.    Google Used Illegal Ties to Cement Its Gatekeeper Role**

16       Google's course of conduct centers on tying, which is a classic form of exclusionary

17  conduct made unlawful under Section 2. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 435 (7th

18  Cir. 2020), *cert. denied*, 2021 WL 2637989 (U.S. June 28, 2021) (tying claim deemed

19  exclusionary under Section 2); *Microsoft*, 253 F.3d at 96-97 (same). The Complaint alleges a

20  series of ties that bolstered Google's gatekeeping position, which Google then used to impose

21  additional, mutually reinforcing, anticompetitive restraints. Plaintiffs' allegations satisfy all three

22  elements of a tying claim: (1) a tie between two distinct products or services; (2) sufficient

23  economic power in the tying product market to coerce customers into purchasing the tied product;

24  and (3) an effect on a not-insubstantial volume of commerce in the tied product market.

25  *PeaceHealth*, 515 F.3d at 912. The third requirement alternatively requires a showing of "a

26  significant negative impact on competition in the tied product market." *Packaging Sys., Inc. v.*

27  *PRC-Desoto Int'l, Inc.*, 2018 WL 735978, at *6 (C.D. Cal. Feb. 6, 2018).

28

Google challenges the first element, asserting that Plaintiffs "do not allege that the products are unavailable separately[.]" Mot. 13. Google is wrong. The Complaint specifically alleges that Google requires that Publishers' access to Google's must-have pool of Advertisers in the Ad Intermediary markets is conditioned on their use of Google's Ad Servers. *See* CC ¶11 ("Google restricted access to its Ad Network and Ad Exchange products to publishers using Google's Ad Server"); CC ¶64 ("Google restricts access to its advertising pool [in the Ad Intermediary Markets] only to those using Google's publisher Ad Server"); *see also id.* ¶¶15, 126. Google itself effectively concedes this tie, arguing that "To reach the advertisers that have chosen to bid through Google, Publishers must of course use Google's services." Mot. 14.

Further, Publishers selecting Google's market dominant Ad Server for small publishers (AdSense) must sell ads exclusively through Google's Ad Network. CC ¶¶62, 131-34. And larger Publishers using Google's Ad Manager "are locked into using Google's Ad Exchange." *Id.* ¶15. In other words, a Publisher can only reach Advertisers bidding through Google's Ad Intermediaries by using Google's Ad Servers. Accordingly, in contrast with the cases Google cites, Mot. 14, Publishers were not free to buy each product separately. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F. 3d 676, 685-86 (4th Cir. 2016) (no evidence that buyers were forced to by tied product with tying); *Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, *5-6 (N.D. Cal. Oct. 30, 2009) (same).

Plaintiffs also plead facts supporting the existence of economic power in the tying product markets to create a factual dispute inappropriate for resolution on a motion to dismiss. Google has 70-90% of the Ad Server market. CC ¶¶70, 171, 173. Where the Ad Intermediaries are tying products, Google has in excess of 50-60%. *Id.* ¶73. Google's power is strong and durable because all three markets have high barriers to entry and expansion. CC ¶¶73, 173-75; *see also* Part I.F, above. That is enough. *See Arista,* 2018 WL 11230167, at *18; *Collegenet, Inc. v. The Common Application, Inc.*, 355 F. Supp. 3d 926, 959 (D. Ore. 2018). Google controls terms applicable to no less than 70% (and likely far more) of Ad Intermediary Markets through its dominant Ad Servers (*see* CC ¶10; *id.* ¶¶88-122)). *See Image Tech* 125 F.3d at 1207 (30% market share in tying product suffices where defendant also had power to set the terms of sale for another 30-35% of market

1    sales).

2        Plaintiffs also show tying market power by alleging that Google has a "unique" product.

3    Because Google has such a large pool of Advertisers bidding through its Ad Intermediaries,

4    "publishers have no choice but to use Google's publisher Ad Server." CC ¶64; *see also id.* ¶¶15,

5    72, 130. *See, e.g.*, *Collegenet*, 355 F. Supp. 3d at 955 (tying market power sufficient where

6    product "so unique that competitors are unable to offer it") (quotation omitted); *Innovative Health*

7    *LLC v. Biosense Webster, Inc.*, 2020 WL 8457483, at *9 (C.D. Cal. Dec. 11, 2020) (tying power

8    shown where defendant "offers a product that is unique or that has special appeal to consumers");

9    *In re Webkinz Antitrust Litigation*, 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010); *RxStrategies,*

10   *Inc. v. CVS Pharmacy, Inc.*, 2019 WL 7584729 (M.D. Fla. Dec. 4, 2019).

11       Plaintiffs satisfy the requirement that the ties, either standing alone or in conjunction with

12   other anticompetitive acts, have a significant negative impact on competition in the tied markets.

13   As a result of the ties, Google has all but eliminated rival ad servers, CC ¶183, and Google uses its

14   dominance in the Ad Server market to "impose anticompetitive rules . . . that artificially warp[] the

15   channels through which publishers sell their ad inventory," in the Ad Intermediary markets. CC

16   ¶9; *see also id.* ¶10. Google's control over rival Ad Intermediaries has contributed to the exit of

17   multiple rivals from the Ad Exchange Market and otherwise substantially foreclosed competition.

18   *Id.* ¶¶186-87; *see also id.* ¶¶179-91.

19       **B.      Google Used Its Gatekeeping Position to Undermine Competition—Not to
                   Compete on the Merits**
20

21       Through its ties and other exclusionary conduct, Google effectively entrenched itself as *the*

22   central auctioneer that also participates in buying and selling at auction. CC ¶¶8-16, 124-34, 153-

23   55; *see also id.* ¶160. This omniscient and conflicted position has enabled Google to exclude

24   competition by imposing auction rules through its Ad Servers that disadvantaged rival Ad

25   Intermediaries, and then repeatedly recalibrated the rules to impair rivals by punishing Advertisers

26   for using rival Ad Intermediaries. *Id.* ¶¶8-16, 89-122.

27       Courts have time and again found that exploiting gatekeeping power to harm rivals—like

28   Google has done here—constitutes exclusionary conduct. In *Arista*, 2018 WL 11230167, at *1,

---

1   Google's lawyer here argued to this Court that Cisco violated Section 2 through a so-called "open

2   early, close late" scheme. Specifically, Arista asserted that Cisco had lured rivals into adopting

3   Cisco's technology, only later to take steps to prevent Arista from using its technology. *Id.* at *10.

4   Just like Google here, Cisco did not have an unqualified right to use its gatekeeping power to

5   impair rivals. *Id.*; *see also Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d

6   495, 505-07 (9th Cir. 2010) (conduct exclusionary where firm improperly coerced oversight body

7   to perpetuate the firm's role as the exclusive regulator of the .com domain name market, and then

8   used that power to refuse domain name registry services on fair terms); *In re Lantus Direct*

9   *Purchaser Antitrust Litig.*, 950 F.3d 1 (1st Cir. 2020) (conduct exclusionary where firm

10  improperly gained monopoly power and then used it to impose anticompetitive royalty agreements

11  on rivals).

12      Indeed, courts have repeatedly condemned dominant incumbents' use of such power to

13  destroy competition—no matter how the gatekeeping position was achieved or maintained. For

14  instance, in *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 785-86 (6th Cir. 2002), the

15  defendant moist snuff manufacturer acted as a "category manager" for retail outlets, consulting on

16  store displays and product placement. The court found that it had abused that gatekeeping power

17  in violation of Section 2 by destroying its rival's store displays and otherwise undermining

18  customer access to rival products. *See also Church & Dwight Co., Inc. v. Mayer Labs. Inc.*, 2011

19  WL 1225912, at *2, 14-15 (N.D. Cal. Apr. 1, 2011) (conduct exclusionary where monopolist

20  condom seller used exclusive dealing and role as "category captain" at retail outlets to exclude

21  rivals from customer displays).

22      Google here misused its illicitly entrenched gatekeeping power by rigging its auctions to

23  punish Advertisers who dealt with rivals. More specifically, Google introduced "first-in-line" and

24  "last look" privileges. CC ¶¶100-09, 112-15. The former allowed Google to determine whether its

25  exchange could beat the highest estimated bid from Advertisers using rival Ad Intermediaries. CC

26  ¶101; *see also id.* ¶¶89-99. If Google's exchange beat the estimate, Google declared itself the

27  winner before any rivals could bid. *Id.* ¶101. Google's "last look" privilege allowed it to lowball

28  initial bids, wait until advertisers using other Ad Intermediaries had responded, and then swoop in

1   and win by bidding only $0.01 more. *Id.* ¶¶104-05, 112-15.

2       Google further exploited its monopoly power and gatekeeping position to require

3   Publishers to deal exclusively with Google relating to the *Publishers' own user and transactional*

4   *data*. CC ¶¶153-54 (not "any data Google is alleged to collect," as Google asserts (Mot.16)). For

5   instance, Google has coerced Publishers to implement Google's AMP format (CC ¶¶178, 154),

6   which Google uses to capture and control Publishers' own user data. Google also forces Publishers

7   to grant Google exclusive access to Publishers' data through its Ad Server, and then "degrade[s]

8   the" publisher user "information available to others . . . , preserving complete information only for

9   itself, by hashing", *i.e.*, encrypting, "user identifiers and providing different identifiers for the

10  same user to the advertiser, on the one hand, and publishers on the other." CC ¶154. Google then

11  systematically withholds user and transactional data from both Publishers and rival Ad

12  Intermediaries, CC ¶153, degrading rivals' ability to make competitive bids. CC ¶¶153-54; CC

13  ¶¶181-82, 185-88.

14      Publishers and Advertisers sought—and ultimately failed—to circumvent Google's rigged

15  auctions by using "header bidding." *See id.* ¶¶110-16. Before Google undermined it, a Publisher

16  could bypass the rules of Google's Ad Server and make its inventory available for simultaneous

17  bidding, "leading to direct competition between bidders, leveling the playing field for rival Ad

18  Exchanges[.]" *Id.* ¶110. Google defeated this competitive alternative by: (i) refusing to allow bids

19  from its dominant Ad Exchange other than through its Ad Server, and then replicating Google's

20  earlier version of "last look" by putting Google's bid in "only after the header bidding auction was

21  complete, in effect nullifying the competition that header bidding provided," *id.* ¶112, (ii) strong-

22  arming publishers into using its AMP format, *id.* ¶178, which was incompatible with header

23  bidding, *id.* ¶114, and (iii) using its Ad Server to interfere with the coding that rival Ad Exchanges

24  had used to facilitate header bidding. *Id.* ¶¶117-18.

25      Having undermined header bidding, CC ¶¶13, 110-18, thereby giving rival Ad

26  Intermediaries no means of reaching Publishers other than through Google's rigged auctions,

27  Google imposed a tax on its rivals' bids. *Id.* ¶¶119-22. And Google maximally structured that tax,

28  not to generate revenue, but to impair its rivals from winning auctions. *Id.* Google asserts that it is

1   "entitled to charge for the use of its technology." Mot. 12-13. But Google misses the point. These

2   taxes were not structured to "charge" for its services, but rather to cause rivals to lose auctions

3   even with higher bids. Google used illicit ties to cement its gatekeeping power with respect to the

4   Ad Intermediary markets and then misused that power with conduct not on the merits to harm

5   rivals and customers.

6   **C.   Plaintiffs Do Not Allege Single-Market Refusals to Deal**

7   Google argues that Plaintiffs have pled a series of single-market refusals to deal in which

8   Google merely employed power emanating naturally from its own technological ingenuity to

9   "favor [its] own products on [its] own platform." Mot. 2, 10-12. Google is wrong. That defense

10   fails for five reasons. First, it assumes Google's gatekeeping power has always been maintained

11   naturally rather than through coercion. Mot. 10 ("There is no allegation here . . . that advertisers or

12   publishers are prevented from bypassing Google entirely[.]"). But that *is false.* Here, Plaintiffs

13   allege that the ties and other exclusionary conduct—including conduct undermining header

14   bidding—impaired rivals' ability to employ alternatives to Google's auctions. As shown above in

15   Part II.B, having illicitly bolstered gatekeeping power, Google does not have an unqualified right

16   to use that power to exclude or impair rivals.

17   Second, Google did not merely passively decline to "participate in header bidding," Mot.

18   12, or otherwise refuse to go out of its way to help rivals. Instead, and akin to the defendants in

19   *Conwood* and *Church & Dwight*, Google aggressively used its gatekeeping power unlawfully

20   entrenched in one market (Ad Server) to throw sand in the gears of rivals in others (Ad

21   Intermediary). For instance, Google actively undermined header bidding by, *inter alia*, interfering

22   with the coding necessary for that competitive alternative, and otherwise rigged auctions to impair

23   rival Ad Intermediaries. *See* Part II.B. *Cf. Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1072-73

24   (10th Cir. 2013)("Put simply if perhaps a little too simply, today a monopolist is much more likely

25   to be held liable for failing to leave its rivals alone than for failing to come to their aid.").

26   Third, Google's conduct undermines rivals *by punishing rivals' customers*—conduct

27   which courts have repeatedly condemned. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S.

28   143, 152-53 (1951) (exclusionary for newspaper to try to destroy a radio station by refusing to sell

ad space to advertisers who ran ads on that station); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 456-58 (1922) (condemning shoe machinery manufacturer that imposed financial penalties on customers for using its machines in combination with competitor's machinery); *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249-51 (D. Utah 1999) (Microsoft's practice of taxing customers for purchasing from rivals was exclusionary). *Cf. F.T.C. v. Facebook, Inc.*, No. CV 20-3590 (JEB), 2021 WL 2643627, at *20 (D.D.C. June 28, 2021) (conduct that "interferes with the relationship between rivals and third parties" is not a "standard refusal to deal" with a competitor). By punishing rivals' customers in this way, Google effectively raises the costs of rivals, which has long been deemed anticompetitive. *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 368 (7th Cir. 1987) (Easterbrook, J.) (by "rais[ing] its rivals' costs" the defendant "raised the market price to its own advantage," an anticompetitive strategy that violates antitrust's "principal purpose"—lowering prices).

The facts here are unlike those of the cases Google cites, Mot. 10-11, in which courts have refused to require entities with *lawfully maintained gatekeeping power* in a single market to *help rivals in that market*. So courts have declined to force a monopolist to rent retail space to a rival on its own resort (*Christy Sports LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188 (10th Cir. 2009)); or put a rival's products in its own vending machines (*Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984)); or link to a rival's website (*Live Universe, Inc. v. MySpace, Inc.*, 304 F. Appx. 554 (9th Cir. 2008)). Those cases have no applicability here. Unlike in those cases, Google's gatekeeping power was cemented through illegal coercive ties. Notably, in *Christy Sports*, where the court found no duty to rent space to a rival, the court also recognized the conduct could well have been exclusionary if the defendant there had "first invite[d] an investment and then disallow[ed] the use of the investment." 555 F.3d at 1196. In other words, had the defendant maintained its gatekeeping power illicitly or through coercion and deceit, such as in, *e.g.*, *Arista*, it would *not* have been free to refuse to rent to its rival. Further, in Google's cases, the defendant was accused of not coming to the aid of a rival, whereas here, like in *Conwood* and *Church & Dwight*, Plaintiffs are alleging that Google has taken multiple affirmative steps to destroy competitive alternatives and disrupt rivals' customer relationships.

For similar reasons, *Pacific Bell Telephone Co. v. linkLine Communications, Inc*., 555 U.S. 438 (2009), Mot. at 10-13, is not on point. In *linkLine*, the defendant was alleged to have used lawfully maintained power in the wholesale market to charge its competitor in the retail market a high price, while charging customers in the retail market a low price. *Id*. at 442. The Court held that the defendant could charge what it wanted in the wholesale market because it had no duty to deal, and could charge low above-cost prices in the retail market. *Id*. at 457. Unlike here, the defendant in *linkLine* did not (a) engage in any exclusionary acts (it charged low, not high prices), (b) punish customers for dealing with rivals, or (c) entrench its gatekeeping power through coercion, deceit, or tying.

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398 (2004), Mot. 2, 10, 12, 16, does not help Google either. In *Trinko*, Verizon was accused of "alleged insufficient assistance in the provision of service to rivals," *Trinko*, 540 U.S. at 410, by failing to "interconnect" its phone network monopoly. Again, and unlike here, there was no suggestion that Verizon had acquired or maintained its gatekeeping power through anything other than its own ingenuity and investments, and there was no argument that the defendant had used tying or other conduct affirmatively to destroy competitive outlets (like, *e.g*., Google's impairing of header bidding here). *Compare Trinko*, 540 U.S. at 410 (Verizon was being accused, not of affirmatively harming rivals, but instead of refusing to engage in "considerable expense and effort" by creating new systems that "must be designed and implemented simply to make [rival] access possible"). Further, *Trinko's* holding that a regulated monopoly, subject to express sharing obligations under a legislatively established regulatory regime, had no duty to deal because the presence of regulation effectively preempted a role for antitrust. *Id.* at 406, 409-11. That is not the case here. Google is not a regulated entity.

*F.T.C. v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), Mot. 13, does not provide Google with cover because there, unlike here, the defendant had done nothing unlawful to acquire or maintain the gatekeeping power it was accused of abusing. *Id.* at 996-97 (distinguishing case in which defendant had improperly maintained gatekeeping power and thus was prohibited from using that power to exclude). Additionally, in *Qualcomm*, the defendant charged the exact same

1    licensing fee whether customers purchased from it or a rival, and the conduct did not "impact

2    competitors" at all. *Id.* at 1002. Here, Google's conduct is designed to punish customers that do

3    not deal exclusively with Google (*cf. Caldera*, 87 F. Supp 2d at 1249 and *Qualcomm* at 969 F.3d

4    at 1000) and interfere with rivals' customer relationships—bid through a rival ad exchange and the

5    bid is subject to the tax and is otherwise less likely to succeed; bid through Google and there is no

6    similar disadvantage. CC ¶¶117-22.

7        The recent decision in the F.T.C.'s litigation with Facebook has no applicability here

8    either. *Facebook* explicitly distinguishes between the unilateral refusals to deal in that case and the

9    kind of tying conduct at issue here, which the court noted would "involve[] some assay by the

10   monopolist into the marketplace that interferes with the relationship between rivals and third

11   parties." *F.T.C. v. Facebook, Inc.*, 2021 WL 2643627, at *20 (D.D.C. June 28, 2021) (internal

12   quotations omitted). *Facebook* highlighted tying in particular because it "occurs when a firm

13   'requires third parties to purchase a bundle of goods rather than just the ones they really want,'

14   thereby leveraging the monopolist's power in the 'tying' product market to harm its competitors

15   (who lose access to customers) in the 'tied' product market." *Id.*

16       Fourth, Google did not exclude with conduct on the merits, *i.e.*, by making its products

17   more attractive to customers; just the opposite. *See New York v. Actavis PLC*, 787 F.3d 638, 652

18   (2d Cir. 2015) (key is to "distinguish 'between conduct that defeats a competitor because of

19   efficiency and consumer satisfaction'" versus conduct that impedes competition in other ways)

20   (citation omitted); *Microsoft*, 253 F.3d at 62, 65 (condemning conduct that reduced rivals' sales

21   "not by improving its own product" or by making its product "more attractive to consumers" but

22   instead by imposing licensing terms preventing market participants from promoting rivals'

23   products). Publishers prefer Ad Servers that "deal with multiple Ad Exchanges" to bring more and

24   better bids, CC ¶10, and yet Google pursued policies that minimized competitive bidding and

25   prioritized its "ability to capture commissions." *Id.* ¶205.

26       Contrary to Google's suggestion that Publishers benefit from Google's auction rigging,

27   Mot. 11-12, Google designed its auctions to reduce incentives to maximize bids, "ensuring that

28   Google wins even where the publisher could get a better price from another Ad Exchange[.]" CC

---

MEMORANDUM IN OPPOSITION                    21              Case No.: 5:20-cv-08984-BLF
TO MOTION TO DISMISS

¶66; *see also id.* ¶105 (Google "depressed the bids and payments to publishers"); *id.* ¶207 ("auction bids would be higher . . . without Google's . . . manipulations"). Google's conduct also harmed Advertisers by enhancing Google's monopoly power, allowing Google to inflate its "take rate." CC ¶¶20, 204-06. In short, Google's conduct made its products *worse* for consumers. This case is therefore unlike *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, LP*, 592 F.3d 991, 1002 (9th Cir. 2010), Mot. 10, where the defendant was accused of using lawfully maintained monopoly power to exclude by "introducing an improved product," and where, unlike here, there was no evidence that the defendant had used monopoly power to force the adoption of its technology. Here, Google degraded its services—and only succeeded in maintaining and enhancing gatekeeping power through coercion and exclusionary conduct.

Fifth, Publishers plead that as a condition of using Google's Ad Server, Publishers must exclusively provide critical user data to Google for as long as they use Google. CC ¶¶179-91, 200-08. This is exclusive dealing, not a refusal to deal. Courts have repeatedly condemned similar schemes by monopolists to exploit exclusive agreements with market participants to lock up a key input. *E.g.*, *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1167-68 (D. Nev. 2016) (distinguishing blocking rivals from accessing key input from a lawful refusal to deal); *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F. Supp. 462, 509 (E.D. Pa. 1972) (same). Google's citation to *Dreamstime.com, LLC v. Google, LLC*, No. 18-cv-01910, 2019 WL 341579, *7 (N.D. Cal. Jan. 28, 2019), Mot. 16, does not help its cause because there, unlike here, the plaintiff had not demonstrated that Google had obtained its data through any means other than its "natural advantages." 2019 WL 341579, at *8.

## III.     The Court Should Evaluate Google's Course of Conduct Collectively

Google invites the Court to err by treating each act as if it were part of a "completely separate and unrelated lawsuit[]." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962). Instead, while each act taken individually is sufficient (as discussed above), "the court should consider the defendant's various acts and examine them collectively for any 'synergistic result.'" *Tele Atlas N.V.*, 2008 WL 4809441, at *23, *quoting California Computer Products, Inc. v. International Business Machines, Corp.*, 613 F.2d 727, 746 (9th Cir. 1979). *See*

1   *also, e.g.*, *Continental Ore*, 370 U.S. at 699; *City of Anaheim v. Southern Cal. Edison Co.*, 955

2   F.2d 1373, 1376, 1378 (9th Cir. 1992); *Simon and Simon, PC v. Align Technology, Inc.*, 2021 WL

3   1309299, *5 (N.D. Cal. April 8, 2021).

4          Dismembering Google's course of conduct would be particularly inappropriate here given

5   that Google's power in the markets at issue is mutually reinforcing, so the various strands

6   necessarily have a synergistic effect. *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d

7   921, 929 (2d Cir. 1981) ("proper inquiry is whether . . . there is a 'synergistic effect'"). The

8   Complaint describes a "vicious cycle" whereby "Google's publisher Ad Server stacked the deck in

9   favor of Google's Ad Exchange." CC ¶11; *see also id.* ¶81. Moreover, it would be nonsensical to

10  evaluate the tying that put Google in the role of gatekeeper separately from exclusionary conduct

11  Google implemented as gatekeeper (*i.e.*, to evaluate at the "close late" as if it did not follow the

12  "open early"). Google's only retort is to assert that combined treatment of the allegations would be

13  improper because none of the alleged acts is an antitrust violation standing alone. Mot. 16. But

14  Google's tying, rival-impairing rules, and other predatory conduct would be cognizable

15  exclusionary acts by themselves.

16         And even if some portions of Google's course of conduct "could not stand alone," courts

17  evaluate elements of such a scheme collectively provided the alleged anticompetitive activities

18  each "tended 'to impair the opportunities of rivals' and 'did not further competition on the

19  merits.'" *Free FreeHand*, 852 F. Supp. 2d at 1184 (quoting *PeaceHealth*, 515 F.3d at 894). *See*

20  *also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (Section 2 claim valid where

21  plaintiff had evidence of a tie along with other conduct, which together impaired rivals), *overruled*

22  *on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012); *Tele Atlas N.V.*,

23  2008 WL 4911230, at *1 (tying claim could not stand alone, but survives as part of an

24  exclusionary course of conduct; "'anticompetitive' conduct may include otherwise *legal* conduct")

25  (emphasis in original); *Simon and Simon PC*, 2021 WL 1309299, at *9 (anticompetitive scheme

26  may include legal conduct where there are synergies); *Le*, 216 F. Supp. 3d at 1168 (same).

27  Google's cited cases on this point, Mot. 16, only address disjointed allegations devoid of

28  standalone violations, and in any event, merely stand for the proposition that acts need to have

1    synergistic effects to qualify for collective consideration. *See City of Groton*, 662 F.2d at 935

2    (rejecting scheme claim because alleged acts could not harm competition); *Dreamstime.com*, 2019

3    WL 341579, at *7 (when viewed as a whole "no rival and no competition has been excluded").

4    The Complaint pleads synergies and reinforcing conduct.

5    **IV.    The California Unfair Competition Law Claims are Well Pled**

6            Because Plaintiffs' antitrust claims survive for the reasons above, there is no basis to

7    dismiss Plaintiffs' Unfair Competition Law ("UCL") claims. Independently, the California

8    Supreme Court has held that the UCL reaches conduct that "threatens an incipient violation of an

9    antitrust law, or violates the policy or spirit of one of those laws . . . or otherwise significantly

10   threatens or harms competition." *Cel-Tech Comm., Inc. v. L.A. Cellular,* 20 Cal. 4th 163, 184-85

11   (1999); *Cent. Valley Med. Grp., Inc. v. Indep. Physician Assocs. Med. Grp., Inc.*, 2019 WL

12   3337891, at *4 (E.D. Cal. July 25, 2019) (*Cel-Tech* creates a "separate class" of claims for

13   "'conduct that significantly threatens or harms competition' [ . . .] an anti-trust violation is not a

14   mandatory predicate for such claims.").

15           While some lower California courts have stated that contracts and combinations that pass

16   scrutiny under a Section 1 Rule of Reason analysis are "not 'unfair,'" (*e.g.*, *Chavez v. Whirlpool*

17   *Corp.*, 93 Cal. App. 4th 363, 375 (2001)), Plaintiffs' antitrust claims arise under Section 2, which

18   protects the market from monopolists and would-be monopolists. CC Counts I-II. Nor can

19   Google's argument be reconciled with *Cel-Tech* or the well-reasoned cases that reject overbroad

20   application of *Chavez. E.g.*, *Cent. Valley*, 2019 WL 3337891 at *4; *Creative Mobile Techs., LLC*

21   *v. Flywheel Software, Inc.*, 2016 WL 5815311, at *5 (N.D. Cal. Oct. 5, 2016).

22           The line of cases that Google cites for the contrary position arose in *dicta* where an

23   independent statute authorized the conduct at issue. *Cent. Valley*, 2019 WL 3337891 at *4; *see*

24   *also San Jose v. Comm'r of Baseball*, 776 F.3d 686, 691-92 (9th Cir. 2015) (citing *Chavez* in *dicta*

25   because a federal statute precluded state law on the issue). It was this line of distinguishable cases

26   that Google presented in *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1034 (N.D. Cal. 2015)

27   (Freeman, J.) (concluding that plaintiffs lacked standing to assert the UCL; citing *Chavez* and *San*

28   *Jose* as alternative grounds).

1

**CONCLUSION**

2

For the foregoing reasons, the Motion should be denied.

3

Dated: July 23, 2021                                    Respectfully submitted,

4

BOIES SCHILLER FLEXNER LLP

5

By: */s/ Philip C. Korologos*

6

Philip C. Korologos*
pkorologos@bsfllp.com

7

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor

8

New York, NY 10001

9

Tel.: (212) 446-2300 / Fax: (212) 446-2350

10

David Boies*
dboies@bsfllp.com

11

BOIES SCHILLER FLEXNER LLP
333 Main Street

12

Armonk, NY 10504

13

Tel.: (914) 749-8200 / Fax: (914) 749-8300

14

Abby L. Dennis*
adennis@bsfllp.com

15

Jesse Panuccio*
jpanuccio@bsfllp.com

16

BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW

17

Washington, DC 20005

18

Tel.: (202) 895-7580 / Fax: (202) 237-6131

19

Mark C. Mao (236165)
mmao@bsfllp.com

20

Sean P. Rodriguez (262437)
srodriguez@bsfllp.com

21

BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor

22

San Francisco, CA 94104

23

Tel.: (415) 293-6820 / Fax: (415) 293-6899

24

Sabria A. McElroy*
smcelroy@bsfllp.com

25

BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200

26

Fort Lauderdale, FL 33301

27

Tel.: (954) 377 4216 / Fax: (954) 356-0022

28

George A. Zelcs*

gzelcs@koreintillery.com
Robert E. Litan*
rlitan@koreintillery.com
Marc A. Wallenstein*
mwallenstein@koreintillery.com
Randall P. Ewing*
rewing@koreintillery.com
Jonathon D. Byrer*
jbyrer@koreintillery.com
Ryan A. Cortazar*
rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

Stephen M. Tillery*
stillery@koreintillery.com
Michael E. Klenov (277028)
mklenov@koreintillery.com
Carol L. O'Keefe*
cokeefe@koreintillery.com
Jamie Boyer*
jboyer@koreintillery.com
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com
jboyer@koreintillery.com

Eric L. Cramer*
ecramer@bm.net
Michael C. Dell'Angelo*
mdellangelo@bm.net
Caitlin G. Coslett*
ccoslett@bm.net
Patrick F. Madden*
pmadden@bm.net
Michaela Wallin*
mwallin@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000 / Fax: (215) 875-4604

Sophia M. Rios (305801)

srios@bm.net
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel.: (619) 489-0300 / Fax: (215) 875-4604

Daniel J. Walker*
dwalker@bm.net
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, NW
Suite 300
Washington DC 20006
Tel.: (202) 559-9745

Michael K. Yarnoff*
myarnoff@kehoelawfirm.com
KEHOE LAW FIRM, P.C.
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tel.: (215) 792-6676

David W. Mitchell
davidm@rgrdlaw.com
Steven M. Jodlowski
sjodlowski@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Tel.: (619) 231-1058 / Fax: (619) 231-7423

Paul J. Geller *
Stuart A. Davidson *
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel.: (561) 750-3000 / Fax: (561) 750-3364

John C. Herman*
jherman@hermanjones.com
Serina M. Vash*
svash@hermanjones.com
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Tel.: (404) 504-6500 / Fax: (404) 504-6501

Robert J. Gralewski, Jr. (196410)
bgralewski@kmllp.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Samantha L. Greenberg (327224)
sgreenberg@kmllp.com
KIRBY McINERNEY LLP
600 B Street, Suite 2110
San Diego, CA 92101
Tel.: (619) 784-1442

Dennis Stewart (99152)
dstewart@gustafsongluek.com
GUSTAFSON GLUEK PLLC
600 B Street, 17th Floor
San Diego, CA 92101
Tel.: (619) 595-3299

Daniel E. Gustafson*
dgustafson@gustafsongluek.com
Daniel C. Hedlund*
dhedlund@gustafsongluek.com
Daniel J. Nordin*
dnordin@gustafsongluek.com
Ling S. Wang*
lwang@gustafsongluek.com
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel.: (612) 333-8844

Marc H. Edelson*
medelson@edelson-law.com
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel.: (215) 867-2399 / Fax: (267) 685-0676

Joshua H. Grabar*
jgrabar@grabarlaw.com
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (267) 507-6085 / Fax: (267) 507-6048

E. Powell Miller*
epm@millerlawpc.com
Sharon S. Almonrode*
ssa@millerlawpc.com
Emily E. Hughes*
eeh@millerlawpc.com

THE MILLER LAW FIRM, P.C.
950 West University Drive, Suite 300
Rochester, MI 48307
Tel.: (248) 841-2200 / Fax: (248) 652-2852

Simon Bahne Paris*
sparis@smbb.com
Patrick Howard *
phoward@smbb.com
SALTZ, MONGELUZZI & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel.: (215) 496-8282 / Fax: (215) 496-0999

Kenneth A. Wexler*
kaw@wexlerwallace.com
Kara A. Elgersma*
kae@wexlerwallace.com
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.: (312) 346-2222

Dianne M. Nast*
dnast@nastlaw.com
Daniel N. Gallucci*
dgallucci@nastlaw.com
Joseph N. Roda*
jnroda@nastlaw.com
NASTLAWLLC
1101 Market Street, Suite 2801
Philadelphia, PA 19106
Tel.: (215) 923-9300

*Pro Hac Vice

Counsel for Publisher Plaintiffs

| 1 | | |
| 2 | | |
| 3 | | |